IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163-JDK |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § | |
| *Defendants.* | § § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR
STAY OF EFFECTIVE DATE AND MOTION FOR
PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT**

Plaintiffs file this appendix in support of their Motion for Stay of Effective Date and Motion for Preliminary Injunction and Brief in Support.

| Tab | Description | APP. Pages |
|---|---|---|
| 1. | Declaration of James Holloway | APP 001-012 |
| 2. | Declaration of James Johnson | APP 013-024 |
| 3. | Declaration of Eric Couch | APP 025-039 |
| 4. | Declaration of Michael Foguth | APP 040-046 |
| 5. | Declaration of John Bellman | APP 047-050 |
| 6. | Declaration of Tyrone Clark | APP 051-054 |
| 7. | Declaration of Kim O'Brien | APP 055-064 |
| 8. | Employee Benefits Security Administration Advisory Opinion 2005-23A (Deseret Letter) | APP 065-068 |

Dated:  May 21, 2024

Respectfully submitted,

By: _/s/ Don Colleluori_____
    Andrew G. Jubinsky
    Texas Bar No. 11043000
    andy.jubinsky@figdav.com
    Parker D. Young
    Texas Bar No. 22204050
    parker.young@figdav.com
    Don Colleluori
    Texas Bar No. 04581950
    don.colleluori@figdav.com

**FIGARI + DAVENPORT, LLP**
901 Main Street, Suite 3400
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (Fax)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

    I hereby certify that, on May 21, 2024, this document was served by email on all parties and/or attorneys of record in this matter through the Court's CM/ECF filing system.

                _/s/ Don Colleluori_____
                Don Colleluori

# TAB 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163 |
| v. | § § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § § | |
| *Defendants.* | § § | |

## <u>DECLARATION OF JAMES HOLLOWAY</u>

1.      My name is James Holloway. I have personal knowledge of the facts set forth herein, all of which are true and correct.

**A. *<u>Background</u>***

2.      I am a member of Federation of Americans for Consumer Choice.

3.      I reside in Tyler, Texas. I am a licensed life insurance and annuity agent in Texas. I have been a licensed insurance agent for over 10 years.

4.      My insurance agency has its primary office in Tyler, Texas, and three satellite offices in Athens, Texas, Sulphur Springs, Texas, and Longview, Texas, all of which are located in various counties in the Eastern District.

5.      I am not and have never been licensed as a broker-dealer representative or registered investment adviser.

6.      I provide insurance product recommendations and sales for clients seeking financial help to save for and protect their retirement. When recommending insurance products, I am very clear with my clients about which insurance carriers I represent and about what role and services I can provide. I do not provide investment advice or discuss my clients' securities investments, nor do I present myself as a professional who engages in those other lines of business.

**B.**  ***Qualified Annuity Sales and Compensation***

7.      As part of my personal practice as a licensed insurance agent, I regularly discuss, market, and sell annuities to be purchased using pre-tax funds – funds primarily from IRAs and, to a lesser extent, 401k plans or other employer-sponsored retirement benefit plans that are subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). Annuities purchased using pre-tax funds are referred to as "qualified annuities."

8.      The majority of my annual annuity sales involve tax-qualified funds. In 2023, I and the other agents associated with my agency sold annuity products with approximately $11 million in premiums, most of which were for qualified annuities.

---

**DECLARATION OF JAMES HOLLOWAY**                                              **PAGE 2**

9.      I and the agents associated with my agency earn a commission on the sale of each qualified annuity. In addition, we may be eligible for commission bonuses as a result of the volume of annuities sold, as well as other forms of non-monetary compensation, incentives, or benefits, such as marketing reimbursements, in-kind marketing services, paid-for travel expenses for industry and insurance product training, and insurance producer training and recognition events. These non-monetary items are provided and paid for either by the insurance carriers themselves or by independent marketing organizations ("IMOs"), which provide additional services and assistance to agents in the delivery of insurance products.

**C.   _The 2024 Fiduciary Rule, Amendments to PTE 84-24, and their Effects_**

10.     I am aware of and generally familiar with some of the provisions and requirements of the new rule (the "2024 Fiduciary Rule") recently adopted by the U.S. Department of Labor (the "DOL") addressing and changing who will be considered a "fiduciary" under ERISA or the Tax Code, as applicable, when the 2024 Fiduciary Rule takes effect. I am also aware of the DOL's amendments to certain prohibited transaction exemptions, including PTE 84-24, made by the DOL contemporaneously with the adoption of the 2024 Fiduciary Rule. I am also aware that the 2024 Fiduciary Rule and updated PTE 84-24 will take effect on September 23, 2024. I am also aware that the amendments to PTE 84-24 provide a one-year phase-in period during which some of the conditions of the exemption are applicable, with all the conditions becoming fully effective on September 23, 2025.

---

11.     If the 2024 Fiduciary Rule and amended PTE 84-24 are permitted to take effect, they will have a tremendous effect on my business because I will be required to rely on PTE 84-24 to continue receiving commissions on the sale of qualified annuities.

**D.  _The Newly Imposed Fiduciary Liability_**

12.     While the new rules will have numerous effects and drastically change the qualified annuity industry, perhaps the single most burdensome and troubling aspect of the September 2024 requirements is that they will immediately subject me to fiduciary liability because one of the phase-in conditions of amended PTE 84-24 requires that I must expressly acknowledge myself as a fiduciary to each customer.

13.     The requirement that I declare myself to be a "fiduciary" of my customers will expose me to new liability risks. For instance, I could easily be sued by a client simply based upon the wrongful claim that I somehow did not satisfy the high standards of fiduciary conduct or meet the Impartial Conduct Standards (discussed below) under PTE 84-24.

14.     I may also face state law causes of action claiming that I did not comply with state law fiduciary standards. If I have to state in writing that I am acting as a "fiduciary" for my clients, I cannot ignore the risk that a state court may decide that I am not only a fiduciary for purposes of ERISA but also a "fiduciary" under state law.

15.     And even if the 2024 Fiduciary Rule is later declared unenforceable, I will then be forced to inform clients that I am no longer a "fiduciary" of theirs, souring

relationships and confusing those clients. This will undoubtedly result in lost business opportunities and loss of goodwill.

16.     The liabilities and burdens imposed by the 2024 Fiduciary Rule will extend far beyond just the sale of qualified annuities under ERISA or the Tax Code. Specifically, in addition to the responsibility and liability of being a fiduciary in connection with any sales of tax-qualified annuities when doing rollovers from employer plans or IRAs, it is likely this status as a fiduciary to a client in the sale of tax-qualified products will spill over to and affect my relationship with the same client vis-à-vis other products that are not tax-qualified, including annuities and other types of insurance. There is no logical way that insurance agents like me will be able to explain to clients that we are not fiduciaries under state law in connection with other product sales. Thus, for example, I may simultaneously sell a given client a tax-qualified annuity for $50,000, a $25,000 non-qualified annuity, a $100,000 life policy, and a Medicare Supplement policy. But, I would have to explain to the client I am a fiduciary only for the tax-qualified sales and just a regular non-fiduciary insurance agent for the other sales. This will be highly confusing to consumers, complicated to explain, awkward for the agent having to explain the differences, and, in the end, would be legally ineffective if the client later successfully alleges there was an implied fiduciary duty across the full relationship.

17.     Finally, even if the courts eventually determine that the 2024 Fiduciary Rule is not enforceable, the damage it will have already inflicted in the interim will not be repairable. In that regard, for any qualified annuity transaction that takes place prior to

invalidation of the new rules, I will have already been forced to disclose and represent to my clients that I am their fiduciary. My clients will, of course, be justifiably relying upon that disclosure when purchasing a qualified annuity. The invalidation of the 2024 Fiduciary Rule therefore will not eliminate the risks of fiduciary-related liability and litigation for transactions that predate its invalidation.

**E.  _The Newly Imposed Impartial Conduct Standards_**

18.    The other condition in effect during the phase-in period under PTE 84-24 requires that I comply with the Impartial Conduct Standards ("ICS"). ICS is an umbrella term covering several requirements and obligations that I must satisfy to comply with PTE 84-24 during the phase-in period. It includes a care obligation, loyalty obligation, receiving no more than reasonable compensation, and not making any materially misleading statements or omissions.

19.    In direct contrast to the requirements of the 2024 Fiduciary Rule and amended PTE 84-24, the current financial and operational structure of my insurance business relating to the sale of qualified annuities is based upon the traditional understanding that insurance agents like me are not typically considered to be fiduciaries under ERISA of the Tax Code and is not designed to meet the ICS.

**F.  _The Newly Imposed Reasonable Compensation Standard_**

20.    The ICS requirement of amended PTE 84-24 that agents may only be paid "reasonable" compensation will have a number of effects on my business.   Because the undefined "reasonableness" standard will limit insurers' willingness to pay commissions

---

**DECLARATION OF JAMES HOLLOWAY**                                               **PAGE 6**

that may be materially more than the industry average for fear that the commissions will be deemed unreasonable, the vague reasonableness test will reduce commissions paid by insurers who would otherwise pay commissions in excess of the average. This will also stifle competition amongst insurers on commission rates. The net effect of this will be that my income will decline if the 2024 Fiduciary Rule becomes effective.

### G. *The Newly Imposed Loyalty Obligation*

21.     In addition to the reasonableness test for compensation, my understanding is that the ICS Loyalty Obligation will now prohibit compensation that could give any impression that I have recommended a product for reasons other than the product's benefit to a client, but it does not clearly define what practices are and are not allowed. The uncertainty around what compensation can and cannot be provided will probably lead carriers and IMOs to limit or discontinue these services, which I will then be required to pay for out-of-pocket to maintain my business. Being forced to go it alone, without the current support received from carriers and IMOs, will make it difficult and more costly for me to sell qualified annuities, thereby reducing my income.

### H. *New Insurer Costs Will Diminish Agent Compensation*

22.     Once all the conditions become effective in September 2025, additional costs for supervision, documentation, and compliance will be incurred by insurers and are likely to be indirectly passed down to me in the form of lower commission structures and/or fewer other financial benefits.

### I. *Agents will Suffer Additional Administrative Burdens, Out-of-Pocket Compliance Costs, and Reduced Income*

---

**DECLARATION OF JAMES HOLLOWAY**                                                    **PAGE 7**

23.     Furthermore, as a result of the legal and financial risks imposed by the 2024 Fiduciary Rule and the amended PTEs, including PTE 84-24, I will have to consider my business as being subject to ERISA's fiduciary requirements if those rules take effect. As a result, complying with the 2024 Fiduciary Rule and PTE 84-24 will directly subject me to additional, costly compliance requirements, such as additional customer disclosures and restructuring of compensation structures, and potential liability under ERISA.

24.     Despite the transitional phase-in period relief from formal compliance with all of the conditions of PTE 84-24, I will still need to conduct a comprehensive investment analysis comparing clients' current qualified plan and IRA holdings, fees, expenses, and investments to any fixed annuity I recommend that a client purchase with qualified funds in order to meet the Care Obligation of the ICS. Although I do evaluate my clients' situation and financial needs to determine if a fixed annuity will effectively address their situation, needs, and objectives, discussions with my clients about the benefits and limitations of a fixed annuity involve comparing those only to the risk of loss with securities generally and I am not required to analyze detailed plan information, such as fees and expenses or allocations of particular securities. Typically, I do not have readily available access to all of that information, which I would need in order to conduct the comparative investment analysis apparently required by PTE 84-24.

25.     Nor do I feel comfortable making such apples-to-oranges comparisons in the manner required by PTE 84-24. The qualified annuities I sell are very different from the

**DECLARATION OF JAMES HOLLOWAY**                                    **PAGE 8**

APP 008

investment options typically available in 401(k) or 403(b) plans and IRAs. I am not licensed to advise clients on their securities portfolios, and the amount of time it would take me, as an insurance agent, to become familiar enough with each client's securities investments to compare them with the qualified annuities I sell is not feasible. While the rollover disclosure requirements are not formally required until September 2025, I will likely feel compelled to begin complying with those costly requirements in September 2024 in order to meet my obligations under the ICS.

26.     Because insurance carriers have no obligations during the phase-in period, I alone will need to establish the framework for how to comply with the ICS, which will entail lots of expense working with ERISA counsel, all of which would be unrecoverable sunk costs if the rule were to be ultimately vacated. Further, although I am merely a distributor of annuity products, I am obligated to receive only "reasonable" compensation and could be subjected to liability if a client later alleges that my compensation was unreasonable. But I have no control over product manufacturing and establishing compensation structures for the products I sell. Those decisions are made by the insurance carriers, who have no PTE 84-24 obligations during the phase-in period.

27.     For these reasons, I am very concerned that I will not be able to satisfy PTE 84-24 at all even though it is the only option available to independent insurance agents to comply with the 2024 Fiduciary Rule and sell qualified annuities. Without a thoroughly developed and reliable compliance program provided by sponsoring insurers, I will need to abandon my qualified annuity business.

---

**DECLARATION OF JAMES HOLLOWAY**                                          **PAGE 9**

28.     The 2024 Fiduciary Rule will also likely force me to pay for services currently covered by insurance carriers or IMOs.  As mentioned above, insurance carriers and IMOs support my business by providing a number of essential services, including product training and education. I estimate that the costs I would otherwise have paid for these services in the past several years would be thousands of dollars per year.

29.     I will also incur costs associated with informing clients of the new disclosures required by the 2024 Fiduciary Rule.

30.     Even if the 2024 Fiduciary Rule is later vacated, I will not be able to get back the time and money spent on compliance costs. As discussed, these costs will be material. Even apart from lost compensation from carriers and increased hard costs, I will need to spend more time on each annuity sale involving qualified funds in order to meet all of the new requirements under the 2024 Fiduciary Rule and PTE 84-24. That means less time to sell products. The 2024 Fiduciary Rule will take time away from my insurance sales function in favor of complying with this labyrinth of new fiduciary requirements, and sales will be lost as a result. These are all sunk costs that will never be recovered.

31.     As a result of the additional compliance requirements and potential liability under ERISA discussed above, my tax-qualified annuity sales, revenue, and income will be diminished because either I will have to decline offering annuities for sale to certain, or perhaps all, customers due to concerns of satisfying ERISA requirements under the 2024 Fiduciary Rule, and/or because potential customers will decline to purchase annuities based on concerns over the disclosures necessary to comply with the new rules.

**J.**   *Insurers' New Supervisory Obligations*

32.    I am also uncertain whether I will be able to satisfy PTE 84-24 because I am entirely dependent on whether the insurance carriers I work with will choose to meet its complex and highly burdensome supervisory requirements created by PTE 84-24. Insurance carriers' supervisory obligations under PTE 84-24 do not take effect until September 2025. I have not yet heard from any of my carriers whether they will implement PTE 84-24's requirements and, if so, when they will begin doing so. Consequently, given the uncertainty and risk I face with all of these new requirements, I will be forced to halt my qualified annuity business until enough reputable insurance carriers build and implement their PTE 84-24 supervisory and compliance programs.

**K.**   *E&O Coverage is Currently Unavailable and Will be More Expensive if it Later Becomes Available*

33.    I currently carry errors and omissions ("E&O") insurance as a life insurance agent.  E&O carriers do not currently insure against fiduciary liability. Even if that sort of E&O coverage subsequently becomes available to insurance agents (which is highly uncertain), the added risk associated with that additional coverage will cause premiums to increase. The liability risk and financial exposure created by the 2024 Fiduciary Rule is too high for me to sell qualified annuities without E&O coverage for any fiduciary-related liability.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this $\underline{20}$ day of May, 2024.

James Holloway

**DECLARATION OF JAMES HOLLOWAY**

**PAGE 12**

<span style="color:red">TAB 2</span>

IN THE UNITED STATES DISTRICT COURT<br>
FOR THE EASTERN DISTRICT OF TEXAS<br>
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICATNS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163 |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § § | |
| *Defendants.* | § | |

## <u>DECLARATION OF JAMES JOHNSON</u>

1.      My name is James Johnson. I have personal knowledge of the facts set forth herein, all of which are true and correct.

**A. *<u>Background</u>***

2.      I am a member of Federation of Americans for Consumer Choice.

3.      I reside in Lindell, Smith County, Texas. I am a licensed life insurance and annuity agent in Texas. I have been a licensed insurance agent for over 25 years.

4.      I provide insurance product recommendations and sales for clients seeking financial help to save for and protect their retirement. When recommending insurance products, I am very clear with my clients about which insurance carriers I represent and

---

about what role and services I can provide. I do not provide investment advice or discuss my clients' securities investments, nor do I present myself as a professional who engages in those other lines of business.

**B.  *TX Titan Group, LLC***

5.      My wife and I are the owners of Plaintiff TX Titan Group, LLC ("TTG"), which is my personal insurance agency.

6.      TTG works with approximately 30 down-line insurance-only agents ("TTG agents") whereby TTG receives a portion of the commission paid, generally referred to as overrides, for certain annuity sales made by each of the downline agents . Those downline agents are independent contractors who TTG assists in its role as an up-line agency to enlist them with insurers and provide various services. In this role, TTG receives a portion of the commission paid by the insurer (commonly referred to as an "override") for annuity sales made by each of the downline agents. None of the down-line agents are licensed as a broker-dealer representative or registered investment advisor.

**C.  *Qualified Annuity Sales and Compensation***

7.      As part of my personal practice as a licensed insurance agent, I regularly discuss, market, and sell annuities to be purchased using pre-tax funds – funds primarily from IRAs and, to a lesser extent,  401k plans or other employer-sponsored retirement benefit plans that are subject to the Employee Retirement Income Security Act of 1974

---

**DECLARATION OF JAMES JOHNSON**                                    **PAGE 2**

("ERISA"). Annuities purchased using pre-tax funds are referred to as "qualified annuities."

8.       The majority of my annual annuity sales are qualified annuities. In 2023, I sold annuity products with approximately $1.5 million in premium, most of which was for qualified annuities. In 2023, TTG's down-line agents sold annuities with a premium value of approximately $500,000, most of which was also for qualified annuities.

9.       I and the other agents working with TTG earn a commission on the sale of each qualified annuity. In addition, we may be eligible for commission bonuses as a result of the volume of annuities we sell, as well as other forms of non-monetary compensation, incentives, or benefits, such as marketing reimbursements, in-kind marketing services, paid-for travel expenses for industry and insurance product training, and insurance producer training and recognition events. These non-monetary items are provided and paid for either by the insurance carriers themselves or by independent marketing organizations ("IMOs") which are up-line of TTG and provide additional services and assistance to agents in the delivery of insurance products.

**D. _The 2024 Fiduciary Rule, Amendments to PTE 84-24, and their Effects_**

10.       I am aware of and generally familiar with some of the provisions and requirements of the new rule (the "2024 Fiduciary Rule") recently adopted by the U.S. Department of Labor (the "DOL") addressing and changing who will be considered a "fiduciary" under ERISA or the Tax Code, as applicable, when the 2024 Fiduciary Rule takes effect. I am also aware of the DOL's amendments to certain prohibited transaction exemptions, including PTE 84-24, made by the DOL contemporaneously with the

**DECLARATION OF JAMES JOHNSON**                                                          **PAGE 3**

adoption of the 2024 Fiduciary Rule. I am also aware that the 2024 Fiduciary Rule and updated PTE 84-24 will take effect on September 23, 2024. I am also aware that the amendments to PTE 84-24 provide a one-year phase in period during which some of the conditions of the exemption are applicable, with all the conditions becoming fully effective on September 23, 2025.

11.     If the 2024 Fiduciary Rule and amended PTE 84-24 are permitted to take effect, they will have a tremendous effect on TTG's business, my business, and the business of the other insurance agents who work with TTG because we will be required to rely on PTE 84-24 to continue receiving commissions on the sale of qualified annuities.

E. *The Newly Imposed Fiduciary Liability*

12.     While the new rules will have numerous effects and drastically change the qualified annuity industry, perhaps the single most burdensome and troubling aspect of the September 2024 requirements is that they will immediately subject me to fiduciary liability because one of the phase-in conditions of amended PTE 84-24 requires that I must expressly acknowledge myself as a fiduciary to each customer.

13.     The requirement that I declare myself to be a "fiduciary" of my customers will expose me and TTG to new liability risks. For instance, I could easily be sued by a client simply based upon the wrongful claim that I somehow did not satisfy the high standards of fiduciary conduct or meet the Impartial Conduct Standards (discussed below) under PTE 84-24.

---

**DECLARATION OF JAMES JOHNSON**                                                                 **PAGE 4**

14.     I may also face state law causes of action claiming that I did not comply with state law fiduciary standards. If I have to state in writing that I am acting as a "fiduciary" for my clients, I cannot ignore the risk that a state court may decide that I am not only a fiduciary for purposes of ERISA, but that I am also a "fiduciary" under state law.

15.     And even if the 2024 Fiduciary Rule is later declared unenforceable, I will then be forced to inform clients that I am no longer a "fiduciary" of theirs, souring relationships and confusing those clients. This will undoubtedly result in lost business opportunities and loss of goodwill.

16.     The liabilities and burdens imposed by 2024 Fiduciary Rule will extend far beyond just the sale of qualified annuities under ERISA or the Tax Code. Specifically, in addition to the responsibility and liability of being a fiduciary in connection with any sales of tax-qualified annuities when doing rollovers form employer plans or IRAs, it is likely this status as a fiduciary to a client in the sale of tax-qualified products will spill over to and affect my relationship with the same client vis-à-vis other products that are not tax-qualified, including annuities and other types of insurance. There is no logical way that insurance agents like me will be able to explain to clients that we are not fiduciaries under state law in connection with other product sales. Thus, for example, I may simultaneously sell a given client a tax-qualified annuity for $50,000, a $25,000 non-qualified annuity, a $100,000 life policy, and a Medicare Supplement policy. But I would have to explain to the client I am a fiduciary only for the tax-qualified sales and just a regular non-fiduciary insurance agent for the other sales. This will be highly

**DECLARATION OF JAMES JOHNSON**                                          **PAGE 5**

confusing to consumers, complicated to explain, awkward for the agent having to explain the differences, and, in end, would be legally ineffective if the client later successfully alleges there was an implied fiduciary duty across the full relationship.

17.     Finally, even if the courts eventually determine that the 2024 Fiduciary Rule is not enforceable, the damage it will have already inflicted in the interim will not be repairable. In that regard, for any qualified annuity transaction that takes place prior to invalidation of the new rules, I will have already been forced to disclose and represent to my clients that I am their fiduciary. My clients will, of course, be justifiably relying upon that disclosure in purchasing a qualified annuity. The invalidation of the 2024 Fiduciary Rule therefore will not eliminate the risks of fiduciary-related liability and litigation for transactions that predate its invalidation.

**F.   _The Newly Imposed Impartial Conduct Standards_**

18.     The other condition in effect during the phase-in period under PTE 84-24 requires that I comply with the Impartial Conduct Standards ("ICS"). ICS is an umbrella term covering several requirements and obligations that I must satisfy to comply with PTE 84-24 during the phase-in period. It includes a care obligation, loyalty obligation, receiving no more than reasonable compensation, and not making any materially misleading statements or omissions.

19.     In direct contrast to the requirements of the 2024 Fiduciary Rule and amended PTE 84-24, the current financial and operational structure of my and TTG's insurance business relating to the sale of qualified annuities is based upon the traditional

---

**DECLARATION OF JAMES JOHNSON**                                   **PAGE 6**

understanding that insurance agents like me are not typically considered to be fiduciaries under ERISA of the Tax Code and is not designed to meet the ICS.

**G. _The Newly Imposed Reasonable Compensation Standard_**

20.     The ICS requirement of amended PTE 84-24 that agents may only be paid "reasonable" compensation will have a number of effects on my business.   Because the undefined "reasonableness" standard will limit insurers' willingness to pay commissions that may be materially more than the industry average for fear that the commissions will be deemed unreasonable, the vague reasonableness test will reduce commissions paid by insurers who would otherwise pay commissions in excess of the average. This will also stifle competition amongst insurers on commission rates. The net effect of this will be that TTG's and my income will decline if the 2024 Fiduciary Rule becomes effective.

**H. _The Newly Imposed Loyalty Obligation_**

21.     In addition to the reasonableness test for compensation, my understanding is that the ICS Loyalty Obligation will now prohibit compensation that could give any impression that I have recommended a product for reasons other than the product's benefit to a client, but it does not clearly define what practices are and are not allowed. The uncertainty around what compensation can and cannot be provided will probably lead carriers and IMOs to limit or discontinue these services, which I will then be required to pay for out-of-pocket to maintain my business. Being forced to go it alone, without the current support received from carriers and IMOs, will make it difficult and more costly for TTG's agents and me to sell qualified annuities, thereby reducing my income.

_____

**DECLARATION OF JAMES JOHNSON**                                              **PAGE 7**

**I.** ***New Insurer Costs Will Diminish Agent Compensation***

22.     Once all the conditions become effective in September 2025, additional costs for supervision, documentation, and compliance will be incurred by insurers and are likely to be indirectly passed down to me in the form of lower commission structures and/or fewer other financial benefits.

**J.** ***Agents will Suffer Additional Administrative Burdens, Out-of-Pocket Compliance Costs, and Reduced Income***

23.     Furthermore, as a result of the legal and financial risks imposed by the 2024 Fiduciary Rule and the amended PTEs, including PTE 84-24, I will have to consider my business as being subject to ERISA's fiduciary requirements if those rules take effect. As a result, complying with the 2024 Fiduciary Rule and PTE 84-24 will directly subject both TTG and me to additional, costly compliance requirements, such as additional customer disclosures and restructuring of compensation structures, and potential liability under ERISA.

24.     Despite the transitional phase-in period relief from formal compliance with all of the conditions of PTE 84-24, I will still need to conduct a comprehensive investment analysis comparing clients' current qualified plan and IRA holdings, fees, expenses, and investments to any fixed annuity I recommend that a client purchase with qualified funds in order to meet the Care Obligation of the ICS. Although I do evaluate my clients' situation and financial needs to determine if a fixed annuity will effectively address their situation, needs, and objectives, discussions with my clients about the benefits and limitations of a fixed annuity involve comparing those only to the risk of

---

APP 020

loss with securities generally and I am not required to analyze detailed plan information, such as fees and expenses or allocations of particular securities. Typically, I do not have readily available access to all of that information, which I would need in order to conduct the comparative investment analysis apparently required by PTE 84-24.

25.     Nor do I feel comfortable making such apples-to-oranges comparisons in the manner required by PTE 84-24. The qualified annuities I sell are very different from the investment options typically available in 401(k) or 403(b) plans and IRAs. I am not licensed to advise clients on their securities portfolios, and the amount of time it would take me, as an insurance agent, to become familiar enough with each clients' securities investments to compare them with the qualified annuities I sell is not feasible. While the rollover disclosure requirements are not formally required until September 2025, I will likely feel compelled to begin complying with those costly requirements in September 2024 in order to meet my obligations under the ICS.

26.     Because insurance carriers have no obligations during the phase-in period, I alone will need to establish the framework for how to comply with the ICS, which will entail lots of expense working with ERISA counsel, all of which would be unrecoverable sunk costs if the rule were to be ultimately vacated. Further, although I am merely a distributor of annuity products, I am obligated to only receive "reasonable" compensation and could be subjected to liability if a client later alleges that my compensation was unreasonable. But I have no control over product manufacturing and establishing compensation structures for the products I sell. Those decisions are made by the insurance carriers, who have no PTE 84-24 obligations during the phase-in period.

**DECLARATION OF JAMES JOHNSON**                                                      **PAGE 9**

27.     For these reasons, I am very concerned that I and the other agents working with TTG will not be able to satisfy PTE 84-24 at all even though it is the only option available to independent insurance agents to comply with the 2024 Fiduciary Rule and sell qualified annuities. Without a thoroughly developed and reliable compliance program provided by sponsoring insurers, I and TTG's other agents will need to abandon our qualified annuity business.

28.     The 2024 Fiduciary Rule will also likely force TTG and me to pay for services currently covered by insurance carriers or IMOs.  As mentioned above, insurance carriers and IMOs support my business by providing a number of essential services, including product training and education. I estimate that the costs TTG and I would otherwise have paid for these services in the past several years would be in the thousands of dollars per year.

29.     TTG and I will also incur costs associated with informing clients of the new disclosures required by the 2024 Fiduciary Rule.

30.     Even if the 2024 Fiduciary Rule is later vacated, I and TTG's other agents will not be able to get back the time and money spent on compliance costs. As discussed, these costs will be material. Even apart from lost compensation from carriers and increased hard costs, we will need to spend more time on each annuity sale involving qualified funds in order to meet all of the new requirements under the 2024 Fiduciary Rule and PTE 84-24. That means less time to sell products. The 2024 Fiduciary Rule will take time away from our insurance sales function in favor of complying with this

APP 022

labyrinth of new fiduciary requirements, and sales will be lost as a result. These are all sunk costs that will never be recovered.

31.     As a result of the additional compliance requirements and potential liability under ERISA discussed above, TTG's and my tax-qualified annuity sales, revenue, and income will be diminished because either we will have to decline offering annuities for sale to certain, or perhaps all, customers due to concerns of satisfying ERISA requirements under the 2024 Fiduciary Rule, and/or because potential customers will decline to purchase annuities based on concerns over the disclosures necessary to comply with the new rules.

**K.** ***Insurers' New Supervisory Obligations***

32.     I am also uncertain whether I will be able to satisfy PTE 84-24 because I am entirely dependent on whether the insurance carriers I work with will choose to meet its complex and highly burdensome supervisory requirements created by PTE 84-24. Insurance carriers' supervisory obligations under PTE 84-24 do not take effect until September 2025. I have not yet heard from any of my carriers whether they will implement PTE 84-24's requirements and, if so, when they will begin doing so. Consequently, given the uncertainty and risk I face with all of these new requirements, I will be forced to halt my qualified annuity business until enough reputable insurance carriers build and implement their PTE 84-24 supervisory and compliance programs.

**L.** ***E&O Coverage is Currently Unavailable and Will be More Expensive if it Later Becomes Available***

---

**DECLARATION OF JAMES JOHNSON**                                    **PAGE 11**

33.     I currently carry errors and omissions ("E&O") insurance as a life insurance agent. E&O carriers do not currently insure against fiduciary liability. Even if that sort of E&O coverage subsequently becomes available to insurance agents (which is highly uncertain), the added risk associated with that additional coverage will cause premiums to increase. The liability risk and financial exposure created by the 2024 Fiduciary Rule is too high for me to sell qualified annuities without E&O coverage for any fiduciary-related liability.

**M. _The DOL is Forcing Me to Accept Liability and Administrative Burdens I Tried to Eliminate in the Past_**

34.     Finally, although I was once licensed as a broker-dealer, I voluntarily and intentionally got out of the securities business more than 10 years ago. One of the primary reasons I ceased working as a securities broker was because of the administrative burdens associated with that business.   Now, if the 2024 Fiduciary Rule takes effect, the DOL is subjecting me to the same sort of liability and administrative burdens that caused me to leave the securities business years ago.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this _20_ᵗʰ day of May, 2024.

James Johnson

# TAB 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163 |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § | |
| *Defendants.* | § § | |

## <u>DECLARATION OF V. ERIC COUCH</u>

1.   My name is V. Eric Couch.  I have personal knowledge of the facts set forth herein, all of which are true and correct.

2.   I am a member of Federation of Americans for Consumer Choice.

3.   I reside in Flower Mound, Texas.  I am a licensed life insurance and annuity agent in Texas and the principal of ProVision Brokerage, LLC ("ProVision").  I have been authorized and engaged in the solicitation of the sale of, among other products, annuities for over 20 years.

4.  ProVision is an independent marketing organization based in Flower Mound, Texas, with approximately 400 insurance agents and financial advisors who are associated with ProVision by virtue of the fact that ProVision is paid a percentage of premiums relative to annuity and insurance sales made by these associated agents.  ProVision's associated agents are independent contractors who ProVision assists in providing their customers with retirement planning and related products, including annuities, and in meeting the requirements of the insurance companies with which ProVision is contracted. ProVision is an intermediary between ProVision's associated insurance agents and approximately 60 insurance companies offering annuities. I find that access to such a broad catalog of different products creates a tremendous advantage for my clients because I can offer a diverse array of products with different benefits, riders, and other features.

5.  In addition to acting as an individual insurance agent myself, I oversee and manage the day-to-day operations of ProVision and am familiar with its business practices, the services it provides, and its finances.

6.  ProVision provides product information, training, marketing ideas, recommendations for vendors with subsidized costs, new business processing and troubleshooting, escalated case reviews, and many administrative "back office" tasks that would be time consuming and difficult, if not impossible, for an independent insurance agent to handle on

**DECLARATION OF V. ERIC COUCH**                                          **PAGE 2**

their own.  ProVision acts on behalf of its contracted insurance companies to recruit agents to offer said insurers' products, train agents to competently and lawfully offer said insurers' products in accord with relevant regulation and insurers' guidelines, and equip associated agents of ProVision to be productive in selling products offered by said insurers.

7. ProVision is qualified to do insurance agency business in all states but is predominantly an annuity agency promoting fixed indexed annuities or FIAs in all states except New York. ProVision and I generated sales of approximately $300 million in 2023 with well over 50% being tax-qualified. ProVision has been operating for 12 years.

8. Most of my annuity clients are primarily concerned with preserving and growing their retirement savings and having retirement income options available as provided for by annuities.  The vast majority of my clients wish to de-risk their retirement savings from an over-concentration in securities where their principal is not protected from market losses and/or take advantage of retirement income options.  Many of my clients desire to move their retirement funds into a fixed annuity for the guaranteed lifetime income benefits --something that is typically not available through their 401(k) plans or existing individual retirement account ("IRA") investments.   Fixed annuities offer these clients many benefits, such as principal protection from

APP 027

market losses, embedded guarantees backed by solvent and highly regulated insurance carriers, and guaranteed lifetime income.

9. Many clients also value the options and riders available through the fixed or guaranteed, non-variable annuities ProVision's agents and I are able to offer, such as multi-year-guaranteed-annuities and FIAs with inflation adjusted guaranteed income, nursing home and terminal illness enhanced payout benefits, enhanced death benefits and return of premium riders that provide liquidity by ensuring premium is refunded upon surrender although surrender charges might be incurred against gains.

10. As part of my personal practice as a licensed insurance agent, I regularly discuss, market, and sell annuities to customers who are considering rolling over funds from a 401k plan or other employer-sponsored welfare benefit plans that are subject to the Employee Retirement Income Security Act of 1974 ("ERISA") or considering other IRA annuity purchases including IRA to IRA transfers.  In fact, the majority of my annual annuity sales involve funds coming from ERISA-related plans or tax-qualified IRAs.  In 2023, I personally sold over $3 million of annuity products to my customers of which over 60% represented tax-qualified funds and approximately 50% are Fixed Index Annuities.

11. ProVision, its associated life insurance agents, and I when acting as an insurance agent earn a standard commission on the sale of each annuity.  In

APP 028

addition, ProVision, its associated agents, and I may be eligible for commission bonuses as a result of the volume of annuities we sell, as well as marketing reimbursements, in-kind marketing services, paid-for travel expenses for industry and insurance product training, and insurance producer training and recognition events.  The insurance carriers and/or independent marketing organizations like ProVision typically provide these items to me and agents associated with ProVision.

12. I am aware of and generally familiar with the provisions and requirements of the new Fiduciary Rule recently adopted by the U.S. Department of Labor (the "DOL") addressing and changing who will be considered a "fiduciary" under ERISA or the Internal Revenue Code (the "Tax Code"), as applicable,  when the 2024 Fiduciary Rule takes effect.  I am also aware of the DOL's amendments to certain prohibited transaction exemptions, including PTE 84-24, made by the DOL contemporaneously with the adoption of the 2024 Fiduciary Rule. I am also aware that certain of the requirements of the new rule particularly requirements related to PTE 84-24 will not take effect until September 2025 – one year after the 2024 Fiduciary Rule otherwise becomes effective as to me and agents associated with ProVision. Specifically, under amended PTE 84-24, immediately upon the September 23,  2024 effective date, I and ProVision's associated agents must declare ourselves fiduciaries and will be subject to the  Impartial Conduct

Standards ("ICS") – whereas effective September 2025 certain other requirements such as onerous and unreasonable disclosures and documentation as to rollovers will become effective.

13. If the 2024 Fiduciary Rule and its amended PTE 84-24 are permitted to take effect, they will have a profound and dramatic effect on my business and the business of ProVision, both upon the effective date of September 2024 requirements and subsequently when the 'phased-in' September 2025 requirements become effective.  By way of example, September 2024 will immediately impose fiduciary liability and specifically the ICS upon me and the associated agents of ProVision, and September 2025 will impose further costly, time-consuming, and burdensome requirements in addition to those immediately in effect in September 2024.

14. The financial and operational structure of my insurance business relating to the sale of annuities, as well as ProVision's, is based upon the traditional understanding that insurance agents like me are not typically considered to be fiduciaries under ERISA, the Tax Code or state law.

15. The requirement of amended PTE 84-24 that agents may only be paid "reasonable" compensation will impact  the business of ProVision's associated agents and me – as well as ProVision's business which is almost exclusively dependent upon override commission.  Additional costs for supervision, documentation, and compliance will be incurred by insurers

APP 030

starting in September 2024 but particularly in September 2025 when all requirements are phased in and likely will be passed down to me and ProVision in the form of lower commission structures and/or fewer other financial benefits.  Moreover, the undefined "reasonableness" standard will not only subject me to potential ERISA liability and litigation, but  also stifle compensation competition amongst insurers offering annuity products due to fear that any commission payments greater than the industry average might be deemed unreasonable.  The net effect of this will be that my income will decline, as will ProVision's and that of ProVision's associated agents.

16. Furthermore, as a result of the legal and financial risks imposed by the new Fiduciary Rule and the amended PTEs, including PTE 84-24, ProVision, its associated agents, and I will all have to consider our businesses as being subject to ERISA's fiduciary requirements if the rules take effect.

17. Complying with the 2024 Fiduciary Rule and PTE 84-24 will subject ProVision, its associated agents, and me to additional, costly compliance requirements, such as additional customer disclosures and documentation, and potential liability under ERISA.

18. My understanding is that effective September 2025 PTE 84-24 will require me to conduct a comprehensive investment analysis comparing clients' current qualified plan and IRA holdings, fees, expenses, and investments to any fixed annuity I or agents associated with ProVision recommend that a

APP 031

client purchase with qualified funds.  Although I and ProVision's agents evaluate clients' financial needs to determine if a fixed annuity will help meet those needs, discussions with my clients about the benefits and limitations of a fixed annuity involve comparing those only to the risk of loss with securities generally and do not require an agent to analyze detailed plan and IRA information, such as fees and expenses or allocations of particular securities.  Typically, agents do not have access to all of that information, which one would need in order to conduct the comparative investment analysis apparently required by PTE 84-24. I and the majority of ProVision agents provide insurance product recommendations and sales for clients seeking financial help to save for and protect their retirement.   When recommending insurance products, we are clear with clients about which insurance carriers we represent and about what role and services we can provide.  I and the majority of ProVision agents do not provide investment advice or discuss my clients' securities investments, nor do we present ourselves as securities professionals who engages in those other lines of business.  Thus, to the extent the 2024 Fiduciary Rule requires that sort of advice when selling qualified annuities,  it would no longer be feasible to continue running my agent business or ProVision as an insurance-only agency. For these reasons, I am very concerned that I and the other agents working with ProVision will not be able to satisfy PTE 84-24 at all even

APP 032

though it is the only option available to independent insurance agents to comply with the new Fiduciary Rule and sell fixed annuities involving qualified funds.

19. I am also uncertain whether I will be able to satisfy PTE 84-24 because I am entirely dependent on whether the insurance carriers ProVision and I work with choose to adopt the complex set of requirements early.   My understanding is that I will have to start complying with key parts of PTE 84-24 on September 23, 2024, including the duties of care and loyalty, the prohibition on excess compensation, and the requirement of full and voluminous disclosure of compensation structures and practices to ensure I and ProVision's associated agents do not violate by way of omission the prohibition on misleading statements, and the written representation that I am a fiduciary.

20. The 2024 Fiduciary Rule will impose significant and unrecoverable costs on me and ProVision with respect to its associated agents at a minimum.   In particular, the requirement that independent insurance agents declare themselves to be "fiduciaries" of our clients will expose me and ProVision's associated agents  to new liability risks.  For example, we might be sued by a client who claims that we did not comply with the 2024 Fiduciary Rule just because the client believes that they were sold a product that is less financially advantageous to them than another.  We may also face state law

actions claiming that we did not comply with state law fiduciary standards. Even though I understand that the preamble language to the new rule suggests otherwise, if I or associated agents have to state in writing that we are acting as a "fiduciary" for clients, we cannot ignore the risk that a state court may agree that we are not only a fiduciary for purposes of ERISA, but also "fiduciaries" under state law. And if the 2024 Fiduciary Rule is later declared unenforceable, we will then be forced to inform clients that we are no longer a "fiduciary" of theirs, souring relationships and confusing those clients – even assuming we can disclaim such liability with respect to a continuing relationship with our clients. This will undoubtedly result in lost business opportunities and loss of goodwill.

21. Moreover, for any qualified annuity transactions that take place prior to a determination that the 2024 Fiduciary Rule is not enforceable, we will have already disclosed and represented to clients that we are their fiduciary. Our clients will, of course, be relying upon that disclosure in purchasing a qualified annuity. The invalidation of the 2024 Fiduciary Rule therefore will not eliminate the risks of fiduciary-related liability and litigation for transactions that predate its invalidation.

22. In addition to the responsibility and liability of being a fiduciary in connection with any sales of tax-qualified annuities when doing rollovers from employer plans or IRAs, it is likely this status as a fiduciary to a client

could spill over to and affect my relationship with the same client *vis-à-vis* other products that are not tax-qualified, including annuities and other types of insurance.  I understand that the DOL purports to be concerned about not misleading consumers as to the role of the agent and that is why it is requiring myself and other agents to declare we are fiduciaries under ERISA or the Tax Code, as applicable.  While that presents its own challenges, there is the additional concern as to how agents such as me would be able to explain to clients that we are not fiduciaries under state law in connection with other product sales.  Thus, for example, with a given client, I may sell them side-by-side a tax-qualified annuity for $50,000 while at the same time selling them a $25,000 non-qualified annuity, a $100,000 life policy, and a Medicare Supplement policy.  But I would have to explain to the client I am only a fiduciary for the tax-qualified sales and just a regular non-fiduciary agent for the other sales.  I believe this is highly confusing to consumers, complicated to explain, awkward for the agent having to explain the differences, and in end likely ineffective to the extent the client can later allege there was an implied fiduciary duty across the full relationship.  These are the kinds of practical issues that the DOL does not appreciate but pose a real challenge for agents like me who then must act more defensively and cannot serve our clients as well in delivering products to meet their retirement needs and give

them the confidence to know they are making good decisions for their financial well-being.

23. I and ProVision currently carry errors and omissions ("E&O") insurance as a life insurance agent and agency. The E&O carriers providing that coverage do not currently insure against fiduciary liability. Even if that sort of E&O coverage subsequently becomes available to me and ProVision, the added risk associated with that additional coverage will cause premiums to increase dramatically.

24. The 2024 Fiduciary Rule will also likely force me or ProVision to pay for services currently covered by our carriers. As explained, carriers support my business by providing a number of essential services, including product training and education. I estimate that the costs I would otherwise have paid for these services in the past several years would be in the thousands of dollars per year. My understanding is that PTE 84-24 will now prohibit compensation that could give any impression that I have recommended a product for reasons other than the product's benefit to a client, but it does not clearly define what practices are and are not allowed. When the DOL imposed similar requirements as part of its earlier rule in 2016, most carriers and IMOs stopped providing these services. Based on that prior experience, I believe that the uncertainty around what compensation can and cannot be provided will again lead carriers and IMOs to limit or discontinue these

APP 036

services, which I will then be required to pay for them out-of-pocket to maintain my business.  Being forced to go it alone, without the current support I receive from carriers and other IMOs, will make it difficult and more costly for me to sell qualified annuities, thereby reducing at a minimum my income as an agent.

25. In addition, ProVision and I will incur significant costs to hire legal counsel to advise us – with respect to both me based on my status as an agent and the associated agents of ProVision – on the 2024 Fiduciary Rule and help ensure our compliance.  The new rule is complex – particularly as it relates to the effect of ICS on agents representing multiple carriers, and the consequences of non-compliance are harsh.  I therefore expect to need a detailed analysis of all parts of my and ProVision's business and assistance building from scratch a comprehensive new compliance program.  Those legal services will be costly, and the additional expense will directly reduce my personal income, as well as ProVision's.

26. ProVision and I will also incur costs associated with informing clients of the new disclosures required by the 2024 Fiduciary Rule.  Given the extensive disclosure requirements to meet the ICS or those inherent in fiduciary status effective September 2024, I estimate that it will cost at least $2,000 - $4,000 to have these disclosures created and an additional $3,000 the first year to manage records, print disclosures, and mail disclosures to clients. Not only

APP 037

are all of these disclosures completely new requirements as of September 2024, just developing disclosures of this nature is foreign to agents such as ProVision's since historically insurers developed these disclosures for their agents and mandated them. The 2024 Fiduciary Rule imposes the disclosure obligations directly upon agents and cuts across all the insurers with which independent insurance agents are appointed so that each agent must develop their own set of disclosures. In addition, I estimate the cost to meet the requirements over the course of 2025 to meet the phase-in requirements effective September 2025 to be $7,000 - $10,000 to have these disclosures created and an additional $3,000 - $4,000 to manage records, print disclosures, and mail disclosures to clients on a going-forward basis.

27. Even if the 2024 Fiduciary Rule is later vacated, I will not be able to get back the time and money ProVision and I spent on compliance costs.  As discussed, these costs will be material.  Even apart from lost compensation from carriers and increased hard costs, I and the other agents working with ProVision will need to spend more time on each annuity sale involving qualified funds in order to meet all of the new requirements under the 2024 Fiduciary Rule and PTE 84-24.  That means less time to devote to other business needs such as mandated training, product training and promoting products to derive revenue.  Essentially, these new regulations will take time away from our insurance sales function in favor of complying with this

labyrinth of new fiduciary requirements, and we will lose sales as a result. These are all unrecoverable costs.

28. As a result of the additional compliance requirements and potential liability under ERISA discussed above, my tax-qualified annuity sales, revenue, and income will be diminished because either I will have to decline offering annuities for sale to certain, or perhaps all, customers due to concerns of satisfying ERISA requirements under the 2024 Fiduciary Rule and amended PTE 84-24, and/or because potential customers will decline to purchase annuities based on concerns over the disclosures necessary to comply with the new rules.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 19th day of May, 2024.

V. Eric Couch

# TAB 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163 |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § | |
| *Defendants.* | § § | |

## <u>DECLARATION OF MICHAEL FOGUTH</u>

1.      My name is Michael Foguth.  I have personal knowledge of the facts set forth herein, all of which are true and correct.

2.      I am a member of the Federation of Americans for Consumer Choice.

3.      I am the president and founder of Foguth Financial Group in Brighton, Michigan.  I am a licensed insurance agent in the State of Michigan and have worked in the financial services business for 17 years.

4.      Foguth Financial Group is an Independent Insurance Agency that provides services to and works with more than 16 licensed independent contractor insurance agents who work with Foguth Financial Group as their exclusive Insurance Agency to promote

---

APP 040

insurance and annuity sales on behalf of insurance companies.  Foguth Financial Group currently has approximately 60 employees who support its Insurance Agency business.

5.      Our practice is growing every year because we reinvest our earnings and continue to follow up with our clients on an ongoing basis, long after they have made their initial purchase from us.

6.      Foguth Financial Group sells fixed-rate and fixed-indexed annuities ("FIAs") and life insurance. We sold approximately $106 million of fixed annuities and FIAs in 2023. Over ninety percent (90%) of the annuities we sell are FIAs.

7.      Approximately seventy percent (70%) of the annuities we sell are to individual retirement accounts ("IRAs") using "qualified" or tax-deferred retirement savings funds that were held in benefit plans subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). FIAs are particularly suitable for IRAs because they provide guaranteed income for the life of the annuitant without the risk associated with securities products, such as variable annuities.

8.      As a result of the Department of Labor's new fiduciary rule that will take effect in September 2024 (the "2024 Fiduciary Rule"), I and the other insurance agents affiliated with Foguth Financial Group will be unable to conduct IRA transactions without satisfying ERISA's fiduciary requirements and meeting the requirements of the amended PTE 84-24.

9.      To meet those requirements, Foguth Financial Group's administrative and compliance costs will increase and its sales, revenue, and income will be significantly

---

DECLARATION OF MICHAEL FOGUTH                                          PAGE 2

decreased.  For example, for each annuity transaction, an individualized disclosure of compensation will be required based upon the specifics of that particular sale.  Also, to the extent compensation paid by any particular insurance company varies based upon different levels of production, at a minimum Foguth Financial Group will have to closely track exactly which transaction(s) might result in a different commission percentage to ensure that the customer disclosure is accurate.  This would be a considerable burden and consume a material amount of employee time and payroll expense that would otherwise be devoted to other business functions. In addition, certain cash and non-cash compensation that varies based upon different levels of production will no longer be permissible once I and agents affiliated with Foguth Financial become fiduciaries in September 2024 subject to DOL's mandated "Impartial Conduct Standards" or ICS.

10.    Foguth Financial Group has access to insurance products from over 40 different insurance carriers, and on average we sell products from approximately 30 different carriers in any given year.  My understanding is that the 2024 Fiduciary Rule will impose specific supervision requirements upon insurers beginning one year after the rule becomes effective September 2024. Effective September 2024 insurers will have responsibility as principals for supervising licensed insurance agents who sell annuities in the interim and such insurers will impose standards of conduct upon agents as well as intermediaries such as Foguth Financial to ensure its associated agents are satisfying the ICS.

11.    Furthermore, since the agents at Foguth Financial Group are subject to supervision by each of the different insurance companies whose products they sell, effective September 2024 it will not only present the possibility of conflicting insurer compliance requirements and directives, but also create an administrative and procedural nightmare requiring extensive involvement and oversight by the members of Foguth Financial Group's management team – all of which are tasks and burdens that are not currently present in the sale of annuities. Foguth Financial must implement changes to effect this starting immediately, and Foguth Financial is currently incurring costs to do so, as well as inconveniences and distractions from Foguth Financial's current business activities.

12.    Our current business operations are being and will be significantly impacted by the 2024 Fiduciary Rule.  At the same time that the new rules are creating additional work for agents, Foguth Financial must consider layoffs with respect to some of Foguth Financial's W-2 employees to deal with the increased costs caused by the new rules.

13.    In addition, the loss of certain cash and non-cash compensation under the ICS noted above will also contribute to the need to layoff some of Foguth Financial's W-2 employees to deal with the diminished revenue caused by the new rules as well as imposing a general diminution of income to Foguth Financial.

14.    The requirement that Foguth Financial Group's agents and producers declare themselves a fiduciary of its clients will expose Foguth Financial Group to new liability risks that it has not been previously.  Under this new standard, Foguth Financial Group can

APP 043

be subject to liability in the event a client is sold a product that is not as advantageous to them financially as another – particularly a non-insurance or securities product.  The amount of due diligence required to protect against this liability will be far greater, and more costly, than any analysis that was ever required in the past.  Whereas in the past an agent would spend an average of  2 to 3 hours determining which product suited the client's needs, an agent will now spend closer to 5-6 hours to ensure this high standard of care is satisfied.

15.     Furthermore, in the event that I and my firm's producers  declare ourselves to be fiduciaries, and the new rule is later declared unenforceable, I and my firm's producers will then be forced to inform clients that despite having previously declared that we are their fiduciaries, we are  no longer a fiduciary of theirs, souring relationships between Foguth Financial Group's agents and their clients. This will undoubtedly result in lost business, as well as business opportunities.  Moreover, if we sell an annuity product having represented in writing to the customer that we are acting as their fiduciary, that particular sale will always be subject to fiduciary obligations and the associated legal exposure that goes along with those obligations regardless of whether the 2024 Fiduciary Rule is subsequently invalidated.

16.     Foguth Financial Group will incur additional legal costs from the hiring of legal counsel to ensure compliance with the new rule. For example, Foguth Financial Group will need legal advice on how to manage the risk of the new fiduciary standard it and its associated agents will be subject to.  Additionally, Foguth Financial Group will

APP 044

need legal advice to ensure compliance with new requirements including but not limited to new client disclosures to meet the ICS requirements starting September 2024 and detailed employer plan and IRA analyses starting September 2025.  After speaking with legal counsel, I am certain that these legal services will, at a minimum, cost $20,000.

17.    Foguth Financial Group has over 3,000 customers and will also incur new costs associated with informing its customers of the new disclosures required under the new rule.  I estimate that it will cost $2,000 to have these disclosures created.

18.    Even if Foguth Financial Group and I can find a way to feasibly continue selling annuities to IRA customers, based on conversations with our E&O liability insurance ("E&O Insurance") broker, E&O Insurance costs will increase dramatically effective September 2024 – at a minimum assuming E&O Insurance coverage remains available -- because E&O providers currently do not insure against ERISA, Internal Revenue Code or common law fiduciary liability. Therefore, the litigation/liability risk introduced by the new 2024 Fiduciary Rule will put my business in serious jeopardy in the event that we are sued for a breach of fiduciary duty or other fiduciary-based claims. Accepting that sort of legal risk simply does not make business sense for licensed insurance agents.  Personally, I will not sell any products that might be governed by the 2024 Fiduciary Rule unless I have comprehensive E&O liability insurance coverage that would cover any future  fiduciary-related claims.  Moreover, even if insurers were to begin offering that sort of E&O coverage (which is uncertain), I would need to increase the amount of my coverage to account for the additional legal risks imposed by the 2024

APP 045

Fiduciary Rule, which would also increase my insurance costs in addition to the rate increase discussed above.

19.     Finally, the 2024 Fiduciary Rule will directly harm Foguth Financial Group's ability to compete in the tax-qualified annuity marketplace.  Foguth Financial Group is a midsize Independent Insurance Agency serving its associated independent agents.  With the additional expenses and other burdens associated imposed by the 2024 Fiduciary Rule, large corporations will be able to further exploit their economies of scale and spread the costs over much larger workforces.  Those companies will therefore be able to increase their share of the available annuity business and also pay their captive employee insurance agents higher commission rates and compensation than Foguth Financial Group can pay the independent agents it works with.  The 2024 Fiduciary Rule will therefore disrupt the current competitive balance in the marketplace by favoring large companies at the expense of Independent Insurance Agencies like Foguth Financial Group.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this ___15th___ day of May, 2024.

Michael Foguth

---

# TAB 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| | § | C.A. No. 6:24-cv-00163 |
| *Plaintiffs,* | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § § | |
| *Defendants.* | § § | |

## <u>DECLARATION OF JON BELLMAN</u>

1.     My name is Jon Bellman.  I have personal knowledge of the facts set forth herein, all of which are true and correct.

2.     I am a  member of Federation of Americans for Consumer Choice.

3.     I am a licensed life insurance and annuity agent in Texas and have been authorized and engaged in the solicitation of the sale of, among other products, annuities for over 30 years. I am 66 years old.

4.     When I am discussing the potential purchase of annuities by existing or potential clients, those individuals frequently consider rolling over funds that were previously maintained in 401k plans or other employer-sponsored welfare

---

**DECLARATION OF JON BELLMAN**                                      **PAGE 1**

benefit plans that are subject to the Employee Retirement Income Security Act of 1974 ("ERISA").  Much of my annual income as an insurance agent comes from the sale of annuities that involve the rollover of funds from a 401k plan or Individual Retirement Account as well as non-rollover tax-qualified annuity sales.

5.     If the new ERISA fiduciary rule adopted by the U.S. Department of Labor (the "DOL"), 89 Fed. Reg. 32122, *et seq*. (April 25, 2024) (the "2024 Fiduciary Rule"), takes effect, I understand that I will be considered a fiduciary under ERISA or the Internal Revenue Code in connection with the sale of tax-qualified annuities to my customers.  That fiduciary status will subject me and my business practices to ERISA requirements and I will have to meet the requirements of a Prohibited Transaction Exemption (a "PTE").

6.     Complying with the 2024 Fiduciary Rule and the requirements of a necessary PTE will subject me and my business to additional compliance requirements, such as additional disclosures and documentation, as well as potential lawsuits and liability under ERISA to which I am not currently exposed.

7.     As a result of these additional compliance requirements and potential liability under ERISA, I and my business will have to adopt new and burdensome procedures, documentation, and administrative tasks for tax-qualified annuity sales.  I will be forced to incur additional out-of-pocket expenses associated with meeting the ERISA requirements, including, for example, the cost of preparing,

---

**DECLARATION OF JON BELLMAN**                                                    **PAGE 2**

printing, and delivering individualized compensation disclosures customized for each transaction, costs for legal advice and form document preparation, etc.  Any additional out-of-pocket expense results in a direct dollar-for-dollar reduction of my personal net income.

8.      Compliance with the ERISA requirements will also place additional burdens on my time and efforts that would otherwise be directed to sales activities and revenue generation, which will lead to a diminution in my overall business activity and particularly my tax-qualified annuity sales.

9.      I am not a registered investment adviser under the Investment Advisers Act of 1940, and as part of my business in assisting clients with insurance and annuities I have never held myself out as a fiduciary investment adviser. Nevertheless, as a result of the DOL's 2024 Fiduciary Rule, I would be subject to an entirely new regulatory regime with respect to many of my customer relationships and the common sales practices that I have long engaged in. In addition, as described above, the 2024 Fiduciary Rule and efforts to comply with the new PTE will directly harm my financial interests.

10.     Given the expenses, burdens, and risks of complying with the 2024 Fiduciary Rule, I will be forced to stop selling all tax-qualified annuities if the new rule is allowed to take effect. This will significantly decrease my income in the future.

**DECLARATION OF JON BELLMAN**                                    **PAGE 3**

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this _15th_ day of May, 2024.

Jon Bellman

# TAB 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| *Plaintiffs,* | § § | C.A. No. 6:24-cv-00163 |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § § | |
| *Defendants.* | § § | |

## <u>DECLARATION OF TYRONE CLARK</u>

1.     My name is Tyrone  Clark.  I have personal knowledge of the facts set forth herein, all of which are true and correct.

2.     I am a  member of Federation of Americans for Consumer Choice.

3.     I am a licensed life insurance and annuity agent in Colorado and the principal  in  an  independent  marketing  organization  ("IMO")  licensed  as  an insurance agency, Brokers Choice of America, Inc. ("BCA"). Through  BCA I engage as an IMO in business in all states except New York.

4.     I have been authorized and engaged in the solicitation of the sale of, among other products, annuities for over 35 years and, as founder and principal of BCA I have been engaged as an IMO for almost 25 years.

5.     Frequently when I or insurance agents affiliated with BCA discuss the potential purchase of annuities by existing or potential clients, those individuals are considering rolling over funds that were previously maintained in 401k plans or other employer-sponsored welfare benefit plans that are subject to the Employee Retirement Income Security Act of 1974 ("ERISA").  Much of my annual income as an insurance agent and a substantial portion of BCA's revenue comes from the sale of annuities that involve the rollover of funds from a 401k plan or Individual Retirement Account as well as non-rollover tax-qualified annuity sales.

6.     If the new ERISA fiduciary rule adopted by the U.S. Department of Labor (the "DOL"), 89 Fed. Reg. 32122, *et seq*. (April 25, 2024) (the "2024 Fiduciary Rule"), takes effect, I understand that I will be considered a fiduciary under ERISA or the Internal Revenue Code ("IRC") in connection with the sale of tax-qualified annuities to my customers.  That fiduciary status will subject me and my business practices to ERISA and IRC requirements and I will have to meet the requirements of a Prohibited Transaction Exemption (a "PTE").

7.     Complying with the 2024 Fiduciary Rule and the requirements of a necessary PTE will subject me and my business to additional compliance

requirements, such as additional disclosures and documentation, as well as potential lawsuits and liability under ERISA to which I am not currently exposed.

8.      Significantly, I and BCA maintain errors & omissions ("E&O") liability insurance. I have been discussing the effects the 2024 Fiduciary Rule will have upon my E&O insurance rates with my insurance broker as well as representatives of potential E&O insurers. Based on these conversations, I have learned that as of the 2024 Fiduciary Rule's September 2024 effective date the E&O insurance rates for my personal E&O insurance as an agent will increase at least 30% and with respect to the E&O insurance maintained for BCA will increase more than 35%.

9.      In addition, the E&O insurance policy for BCA will become more complex as of September 2024 I am informed because the coverage terms will be different for coverage of BCA affiliated agents who engage in rollovers versus those who do not. Specifically, BCA agents who intend to engage in rollover transactions on behalf of BCA will require to be covered as fiduciaries at a higher rate than BCA agents who do not intend to so engage. However, BCA must implement compliance procedures to ensure the latter agents do not engage in any rollover transactions during the policy term. This will impose additional controls and compliance requirements on BCA that must be developed immediately at additional cost to BCA.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this __19__ day of May, 2024.

Tyrone Clark

APP 054

TAB 7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC.; JAMES HOLLOWAY; JAMES JOHNSON; TX TITAN GROUP, LLC; PROVISION BROKERAGE, LLC; and V. ERIC COUCH, | § § § § § § § | |
| | § | C.A. No. 6:24-cv-00163 |
| *Plaintiffs,* | § § | |
| v. | § § | |
| UNITED STATES DEPARTMENT OF LABOR and JULIE SU, in her official capacity as ACTING SECRETARY OF LABOR, | § § § § § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF KIM O'BRIEN

1.      My name is Kim O'Brien. I have personal knowledge of the facts set forth

herein, all of which are true and correct.

### A. *Background*

2.      I have over 40 years of experience in the insurance industry, including nearly

twenty years leading insurance industry trade associations and more than twenty years

working in annuity and life product development for major insurance carriers.

3.      I am the chief executive officer of Plaintiff Federation of Americans for

Consumer Choice ("FACC"), an Internal Revenue Code section 501(c)(6) organization

incorporated in Texas.

---

**DECLARATION OF KIM O'BRIEN**                                                          **PAGE 1**

## B. *FACC*

4.      FACC is dedicated to advancing and advocating for the interests of independent insurance agents and agencies in the distribution of guaranteed insurance products, as well as providing its members opportunities for education and advancement in all aspects of their independent agent and agency businesses.

5.      Independent insurance agents offer life insurance, annuities, long-term care insurance, and certain health insurance (*e.g.*, medicare supplement and medicare advantage) products on behalf of multiple insurers. Independent agents are not employees of an insurer or exclusive to an insurer.

6.      Independent marketing organizations ("IMOs") are independent insurance agencies that, like independent agents, represent numerous insurance companies as intermediaries between the insurers and the independent agents. IMOs provide training and marketing services to agents, among other things, and motivate agents to improve their business practices and enhance their revenue generation.

7.      FACC has both agent and IMO members who predominantly offer fixed indexed annuities in all states other than New York but also offer other insurance products nationwide. Tax-qualified annuity products represent approximately 40% to 60% of FACC members' annuity revenue.

8.      FACC was founded to represent and give voice to the interests of its membership consisting of independent insurance agents and agencies in matters of public policy with a focus on:

(a) recognizing the value of guaranteed insurance and annuity products and related services offered through the independent distribution channel; and

(b) preserving freedom of choice for consumers who benefit from the services of independent agents licensed to sell guaranteed insurance and annuity products on behalf of multiple carriers.

9.      In my role at FACC, I speak and consult with FACC members and other actors in the insurance industry on a regular basis. I am familiar with the issues and concerns of independent insurance agents, agencies, and IMOs, as well as insurers and other parties involved in the independent distribution channel with respect to the delivery of products and services to consumers.

## C. *The 2024 Fiduciary Rule, Amendments to PTE 84-24, and their Effects*

10.      Studies show that retirement savers are worried about their financial future and want the freedom to choose products that come with guarantees that give them peace of mind.  A nationwide study commissioned by the American Council of Life Insurers showed that over 80% of respondents worry about having enough savings to last through retirement, over half are considering a guaranteed lifetime income product, and nearly three-quarters—most of whom do not already have a pension plan—would be interested in independently purchasing a guaranteed lifetime income product that pays out like a pension. *Economic Climate Has Retirement Savers Eyeing Guaranteed Lifetime Income and Financial Planning Options, Morning Consult Survey Finds*, https://www.acli.com/posting/nr23-037, May 22, 2023.

11.      I am aware of and generally familiar with some of the provisions and requirements of the new rule recently adopted by the U.S. Department of Labor (the

---

"DOL"), 89 Fed. Reg. 32122, *et seq.* (April 25, 2024) (the "2024 Fiduciary Rule") addressing and changing who will be considered a "fiduciary" under ERISA or the Tax Code, as applicable, when the 2024 Fiduciary Rule takes effect. I am also aware of the DOL's amendments to certain prohibited transaction exemptions, including PTE 84-24, made by the DOL contemporaneously with the adoption of the 2024 Fiduciary Rule. I am also aware that the 2024 Fiduciary Rule and updated PTE 84-24 will take effect on September 23, 2024. I am also aware that the amendments to PTE 84-24 provide a one-year phase-in period during which some of the conditions of the exemption are applicable, with all the conditions becoming fully effective on September 23, 2025. As discussed below, the 2024 Fiduciary Rule and the portions of amended PTE 84-24 that take effect on September 23, 2024, will operate to impair the independent distribution channel and thereby reduce consumers' options and ability to access tax-qualified annuities sold by independent insurance agents in order to meet their retirement planning goals and needs.

**D. *FACC's Members Will Be Exposed to Newly Imposed Liabilities***

12.    If the 2024 Fiduciary Rule takes effect, FACC's agent members will be considered fiduciaries under ERISA or the Tax Code in connection with the sale of tax-qualified annuities to their customers. That fiduciary status will subject FACC's members and their business practices to certain ERISA or Tax Code requirements, which in turn will require them to meet certain requirements of a Prohibited Transaction Exemption (a "PTE") in order to continue receiving commission or other forms of agent compensation in connection with the selling of those products.

---

APP 058

13.     Starting September 23, 2024 independent insurance agents will have to declare or acknowledge they are fiduciaries in order to offer tax-qualified products, including FIAs, and will also be subject to Impartial Conduct Standards ("ICS") imposed by the DOL. As a result, these same agents will thereafter only be able to offer tax-qualified insurance products if they satisfy the phase-in requirements of amended PTE 84-24, which is only available for independent agents and, furthermore, is the only PTE under which independent agents can operate. PTE 2020-02 will not be available for independent agents absent a financial institution to provide supervision and act as a co-fiduciary.

14.     On September 23, 2024, agents and agencies, as well as up-line IMOs and insurers, will face potential liability under ERISA and/or the Internal Revenue Code to which they are not currently exposed, as well as be subject to ICS. This liability includes, among other things, regulation, oversight, and enforcement by the DOL and the Internal Revenue Service, as well as private action liability under ERISA in connection with rollover transactions. The potential liability to FACC's agent members will be direct and immediate while at the same time up-line agencies and insurers will likewise be subject to potential vicarious liability.

## E.  *FACC's Members Will Incur New Compliance Costs*

15.     Under the new rules, independent insurance agents who sell tax-qualified annuities will be subjected to additional costly compliance requirements both before and after the 2024 Fiduciary Rule and amended PTE 84-24 take effect on September 23, 2024. These costs include developing additional disclosures and documentation requiring the

APP 059

assistance of hired legal counsel or other retained compliance professionals prior to September 23, 2024, as well as developing and implementing changes to business practices in order to manage or eliminate amounts or forms of compensation that would be considered impermissible under the ICS requirements of PTE 84-24 and/or other provisions of the 2024 Fiduciary Rule.

16.     When all of the new PTE 84-24 requirements become fully effective on September 23, 2025, agents will be subjected to even more out-of-pocket costs. The additional expenses FACC's members will incur at that time include, for example, the cost of preparing, printing, and delivering individualized compensation disclosures customized for each transaction, costs for legal advice and form document preparation, etc.

17.     Any additional out-of-pocket expense imposed by the 2024 Fiduciary Rule or PTE 84-24 will result in a direct dollar-for-dollar reduction of an independent agent's personal net income.

**F.** ***The 2024 Fiduciary Rule and PTE 84-24 Exceed NAIC Model Regulation Requirements***

18.     The requirements under the 2024 Fiduciary Rule and accompanying PTE 84-24 go well beyond what is required by existing state law, including the best interest obligations required under the National Association of Insurance Commissioners (NAIC) Model Regulation.

19.     The NAIC updated its Model Regulation #275 relating to sales conduct in 2020 in order to include best interest obligations regarding care, disclosure, conflict of interest, and documentation. As of today, forty-five states, including Texas, have adopted

APP 060

the NAIC Model Regulation and other states are in the process of adopting the NAIC Model Regulation.

20.     Agents are also subject to many other state insurance laws with respect to licensure, continuing education, advertising, and disclosure designed to provide proper consumer protection. The 2024 Fiduciary Rule and PTE 84-24 create a new regime of regulation that does not currently exist for insurance agents selling guaranteed insurance and annuity products.

G. *FACC Members Will Suffer New Administrative Burdens*

21.     To satisfy the new rules that become effective in September 2024, insurance agents, their agencies, and IMOs will need to develop disclosures and documentation, compliance processes and procedures, and otherwise perform a myriad of new administrative tasks for all tax-qualified annuity sales, which FACC knows to account for approximately 40-60% of its members' annuity sales.

22.     By no later than September 23, 2025, when amended PTE 84-24 becomes fully effective, including but not limited to the supervision requirements for insurance companies, independent agents will also need to manage and implement all of the various rules and requirements of the multiple carriers whose products they sell. This is an extreme burden and expense on most insurance agents who by definition under PTE 84-24 represent multiple insurance companies and operate in multiple states.

**H.** ***E&O Coverage for FACC Members Will Exclude Fiduciary Coverage and be More Expensive***

23.     A canvassing of FACC members conducted by me has informed FACC that FACC members are already preparing for changes to their  Errors and Omissions liability insurance coverage ("E&O coverage")  that will occur as of September 2024. FACC members are being told they will experience increases in E&O coverage premiums in the likely range between 20-40%, with many being told by their E&O Coverage brokers and insurers that they may not be able to obtain coverage for rollover transactions and tax-qualified sales.

24.     In fact, a reputable E&O insurance broker who works with insurance agents and agencies has informed me that fiduciary liability will be excluded from coverage in most instances. Nevertheless, the 2024 Fiduciary Rule will still lead to the aforementioned premium increases because agents' fiduciary status will invite more lawsuits that must be defended by E&O coverage insurers even though the fiduciary claims are excluded from coverage.

**I.** ***FACC Members Will Suffer Diminished Revenues and Income***

25.     Beginning September 23, 2024, compliance with the requirements of the 2024 Fiduciary Rule and amended PTE 84-24 will also place additional burdens on FACC's members' time and efforts that would otherwise be directed to business activities such as training and marketing, leading to a diminution in revenue generation.

26.     These additional compliance burdens and legal risks inherent in the 2024 Fiduciary Rule and PTE 84-24 will also lead to a diminution in tax-qualified annuity sales

APP 062

by FACC's members because, in certain instances, these members will decline to offer tax-qualified annuities for sale due to concerns about satisfying the the new rules regardless of whether they can obtain E&O Coverage or successfully implement new compliance requirements. Because of the 2024 Fiduciary Rule and amendments to PTE 84-24, some FACC members have advised they will simply avoid the risk of offering rollover or qualified sales by ceasing to offer those services.

27.    To ensure that there is no possibility of a wrongful claim that an agent, agency, or IMO may have violated the "reasonable compensation" requirements of the new rules, FACC's members will also be forced to forgo additional marketing and business services compensation that they were previously receiving and that would traditionally be used to cover overhead costs.

## J. *FACC Itself Will Suffer Irreparable Damages*

28.    Furthermore, as FACC members elect to stop selling tax-qualified sales because of the 2024 Fiduciary Rule, it is likely that they may also consider their membership in FACC to no longer be necessary, thereby resulting in a reduction in FACC's membership base and commensurate reduction in the membership fees it is able to generate to help support its purpose and initiatives designed to offer consumers greater access to guaranteed insurance and annuity products. Once members and their associated fees have been lost, there is no way for FACC to recover those lost revenues even if the 2024 Fiduciary Rule is later determined to be invalid or unenforceable.

---

**DECLARATION OF KIM O'BRIEN**                                        **PAGE 9**

29.     For all of the foregoing reasons, the 2024 Fiduciary Rule and the acts required to comply with the new PTE 84-24 will directly harm the financial interests of FACC's members, as well as the financial interests of FACC itself.

I declare under penalty of perjury that the foregoing is true and correct. EXECUTED on this 21st day of May 2024.

_____
Kim O'Brien

TAB 8

🔵 **U.S. DEPARTMENT OF LABOR**

**Employee Benefits Security Administration**

# Advisory Opinion   005–23A – WITHDRAWN AS OF 6/29/2020

December 7, 2005

2005-23A

3(21)

Michael 'J' Stapley
President
Deseret Mutual Benefit Administrators
Eagle Gate Plaza
60 East South Temple
P.O. Box 45530
Salt Lake City, UT 84145

Dear Mr. Stapley:

This is in response to your request for guidance concerning the fiduciary responsibility provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). You have requested guidance concerning the responsibilities of plan fiduciaries regarding the advice and other services provided directly to plan participants by financial planners or advisers. For purposes of this letter, we assume that the planner or adviser is neither chosen nor promoted by plan fiduciaries and is not otherwise a fiduciary with respect to the plan. In that context, you ask a number of questions.

The relevant statutory provisions are as follows. Section 3(21)(A) of ERISA provides that a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Sections 403(c)(1) and 404(a) of ERISA require, among other things, that the assets of a plan be held for the exclusive purpose of providing benefits to participants and beneficiaries of the plan and defraying reasonable administrative expenses of administering the plan, and that a fiduciary with respect to the plan carry out his duties for the exclusive purpose of providing benefits to participants and beneficiaries.

Where an individual account pension plan permits a participant or beneficiary to exercise control over the assets in his or her account and a participant or beneficiary exercises such control, section 404(c) provides that no other person who is otherwise a fiduciary shall be liable for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control.

Section 405(a) of ERISA provides that a fiduciary of a plan may be liable for a breach of fiduciary responsibility committed by another fiduciary of the plan: (1) if he knowingly participates in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) of ERISA in the exercise of his fiduciary obligations, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of the breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

Section 406(a) of ERISA prohibits various types of transactions between a plan and persons who are parties in interest with respect to the plan. In particular, section 406(a)(1)(D) prohibits a fiduciary from engaging in a transaction if the fiduciary knows or should know that the transaction is a direct or indirect transfer to, or use by or for the benefit of any party in interest, of the assets of the plan. Section 406(b) of ERISA prohibits a fiduciary with respect to a plan from dealing with assets of the plan in his own interest or for his own account, acting on behalf of or representing a party dealing with the plan in a transaction involving the assets of the plan, or receiving any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan.

The following is a summary of the questions presented in your letter and our responses thereto.

*Question 1:*  Is an individual who advises a participant, in exchange for a fee, on how to invest the assets in the participant's account, or who manages the investment of the participant's account, a fiduciary with respect to the plan within the meaning of section 3(21)(A) of ERISA?

*Answer:*  The Department has stated on numerous occasions that directing the investment of a plan constitutes the exercise of authority and control over the management or disposition of plan assets and that the person directing the investments would be a fiduciary, even if the person is chosen by the participant and has no other connection to the plan. In addition, regulation 29 CFR § 2510-3.21(c) further clarifies the meaning of the term "investment advice."  Under that regulation, a person will be deemed to be rendering investment advice if such person renders advice to the plan as to the value of securities or other property, or makes a recommendation as to the advisability of investing in, purchasing, or selling securities or other property and such person either directly or indirectly has discretionary authority or control, whether or not pursuant to an agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or renders any such advice on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments. The Department has taken the position that this definition of fiduciary also applies to investment advice provided to a participant or beneficiary in an individual account plan that allows participants or beneficiaries to direct the investment of their accounts. 29 CFR § 2509.96-1(c).

In the context of a participant-directed individual account plan meeting the requirements of ERISA section 404(c), a person, such as a financial planner or investment manager or adviser, who is selected by a participant to manage the participant's investments would be liable for imprudent investment decisions because those decisions would not have been the direct and necessary result of the participant's exercise of control, even though the participant selected the person to manage the assets in his or her individual account.[1] The other fiduciaries of the plan would not be liable as fiduciaries for either the selection of the investment manager or investment adviser or the results of the investment manager's decisions or investment adviser's recommendations.[2] Nor would the plan fiduciaries have any obligation to advise the participant about the investment manager or investment adviser or their investment decisions or recommendations. See 29 CFR § m2550.404c-1(f) -- Example (9).

*Question 2:*  Does a recommendation that a participant roll over his or her account balance to an individual retirement account (IRA) to take advantage of investment options not available under the plan constitute investment advice with respect to plan assets?

*Answer:*  It is the view of the Department that merely advising a plan participant to take an otherwise permissible plan distribution, even when that advice is combined with a recommendation as to how the distribution should be invested, does not constitute "investment advice" within the meaning of the regulation (29 CFR § 2510-3.21(c)).[3] The investment advice regulation defines when a person is a fiduciary by virtue of providing investment advice with respect to the assets of an employee benefit plan. The Department does not view a recommendation to take a distribution as advice or a recommendation concerning a particular investment (*i.e.*, purchasing or selling securities or other property) as contemplated by regulation § 2510.3-21(c)(1)(i). Any investment recommendation regarding the proceeds of a distribution would be advice with respect to funds that are no longer assets of the plan.[4]

Where, however, a plan officer or someone who is already a plan fiduciary responds to participant questions concerning the advisability of taking a distribution or the investment of amounts withdrawn from the plan, that fiduciary is exercising discretionary authority respecting management of the plan and must act prudently and solely in the interest of the participant.[5] Moreover, if, for example, a fiduciary exercises control over plan assets to cause the participant to take a distribution and then to invest the proceeds in an IRA account managed by the fiduciary, the fiduciary may be using plan assets in his or her own interest, in violation of ERISA section 406(b)(1).

*Question 3:*  Would an advisor who is not otherwise a plan fiduciary and who recommends that a participant withdraw funds from the plan and invest the funds in an IRA engage in a prohibited transaction if the advisor will earn management or other investment fees related to the IRA?

*Answer:*  No. For the same reasons explained above, a recommendation by someone who is not connected with the plan, that a participant take an otherwise permissible distribution, even when combined with a recommendation as to how to invest distributed funds, is not investment advice within the meaning of the 29 CFR § 2510-3.21(c), nor is such a recommendation, in and of itself, an exercise of authority or control over plan assets that would make a person a fiduciary within the meaning of section 3(21)(A) of ERISA. Accordingly, a person making such recommendations would not be a fiduciary solely on the basis of making such recommendations, and would not engage in an act of self-dealing if he or she advises the participant to roll over his account balance from the plan to an IRA that will pay management or other investment fees to such person.

However, as indicated above with respect to question 2, this position applies only to advice provided by a person who is not a plan fiduciary on some other basis. Advice of this nature given by someone who is already a fiduciary of the plan would be subject to ERISA's fiduciary duties. Moreover, if the person exercised control over the participant's account in making the distribution and reinvestment outside the plan, the person would be a fiduciary and would be subject to the ERISA's fiduciary obligations.

This letter constitutes an advisory opinion under ERISA Procedure 76-1 (41 Fed. Reg. 36281, August 27, 1976). Accordingly, this letter is issued subject to the provisions of the procedure, including section 10 relating to the effect of advisory opinions.

**Sincerely,**

Louis Campagna
Chief, Division of Fiduciary Interpretations
Office of Regulations and Interpretations

---

# Footnotes

1. *See* Advisory Opinion 84-04A, January 4, 1984 (AO 84-04A). In particular, AO 84-04A stated that if a person is deemed to be giving investment advice within the meaning of regulation § 2510.3-21(c)(1)(ii)(B), the presence of an unrelated second fiduciary acting on the investment advisors recommendations on behalf of the plan is not sufficient to insulate the investment advisor from fiduciary liability under section 406(b) of ERISA. Regulation § 2510.3-21(c)(1)(B) presupposes the existence of a second fiduciary who by agreement or conduct manifests a mutual understanding to rely on the investment advisor's recommendations as a primary basis for the investment of plan assets. In the presence of such an agreement or understanding, the rendering of investment advice involving self-dealing will subject the investment advisor to liability under section 406(b) of ERISA. We believe that the same principles enunciated in AO 84-04A apply in the context of a financial planner or investment advisor rendering investment advice to a participant in a participant-directed plan.

2. Other fiduciaries of the plan may have co-fiduciary liability of the plan if, for example, they knowingly participate in a breach committed by the participant's fiduciary. ERISA section 405(a).

3. We note that a person recommending that a participant take a distribution may be subject to Federal or state securities, banking or insurance regulation.

4. In the view of the Department, the situation described herein is distinguishable from those situations where a plan fiduciary exercises control over the timing of the distribution, the selection of the individual retirement plan provider and the products in which the distributions will be invested. For example, situations such as those involving automatic rollovers of mandatory distributions. *See* 29 CFR 2550.404a-2 (69 FR 58018, September 28, 2004). *See also,* AO 93-24A (September 13, 1993) and the letter from Robert J. Doyle to Judith McCormick, August 11, 1994.

5. *See* Varity Corp. v. Howe, 516 U.S. 489, 502-03 (1996).

**Employee Benefits Security Administration**

An agency within the U.S. Department of Labor

200 Constitution Ave NW
Washington, DC 20210

1-866-444-3272

**FEDERAL GOVERNMENT** ⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

**LABOR DEPARTMENT** ⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**ABOUT THE SITE** ⊞

Freedom of Information Act

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

Submit Feedback

w.dol.gov/agencies/ebsa

Connect With DOL

    

Site Map   |   Important Website Notices   |   Privacy & Security Statement

Submit Feedback

APP 068