**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC., et al., )<br><br>                                        Plaintiffs, )<br><br>          v. )<br><br>UNITED STATES DEPARTMENT OF LABOR and JULIE SU, acting in her official capacity as Acting Secretary of Labor, )<br><br>                                        Defendants. ) | Civil Action No. 6:24-cv-00163-JDK |

**BRIEF OF AMICUS CURIAE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA IN SUPPORT OF
PLAINTIFFS' MOTION FOR STAY OF EFFECTIVE DATE AND
<u>PRELIMINARY INJUNCTION</u>**

OF COUNSEL:

William M. Jay
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036

Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Kevin Palmer
Maria C. Monaghan
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Kendyl T. Hanks
GREENBERG TRAURIG LLP
Texas Bar No. 24032273
300 West 6th Street, Suite 2050
Austin, TX  78701
T: (512) 320-7200
F: (512) 320-7210
hanksk@gtlaw.com

*Counsel for Amicus Curiae the Chamber of
Commerce of the United States of America*

**TABLE OF CONTENTS**

**Page**

INTEREST OF THE AMICUS CURIAE ................................................................... 1

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 5

    I.      The Rule cannot be reconciled with ERISA's text and structure, or with
           Fifth Circuit precedent. ......................................................................... 7

          A.     The Rule's expansive definition of fiduciary defies the common
                law meaning that ERISA incorporated. ....................................... 7

          B.     DOL impermissibly collapsed the distinction between the fiduciary
                duties imposed by Titles I and II of ERISA............................ 10

          C.     The Rule intrudes on turf that Congress assigned to other
                regulators.................................................................................... 12

    II.     This Rule will significantly harm investors by making important financial
           services more costly and less available.................................................. 16

CONCLUSION........................................................................................................... 22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*Allen v. GreatBanc Tr. Co.*,
  835 F.3d 670 (7th Cir. 2016) ..............................................................................18

*Am. Securities Ass'n, v. U.S. Dep't of Labor*,
  No. 8:22-cv-330-VMC-CPT, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023)...........................4

*Babb v. Wilkie*,
  589 U.S. 399 (2020).............................................................................................12

*Chamber of Commerce of United States of America v. U.S. Department of Labor*,
  885 F.3d 360 (5th Cir. 2018) ...................................1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16

*Cunningham v. Cornell Univ.*,
  86 F.4th 961 (2d Cir. 2023) ................................................................................18

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) ............................................................................18

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................18

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan ex rel. Lyon v. Buth*,
  99 F.4th 928 (7th Cir. 2024) ..............................................................................18

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993).............................................................................................5

*PBGC ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)................................................................................17

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*,
  960 F.3d 190 (5th Cir. 2020) ................................................................................1

*XY Planning Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020)................................................................................15

**Statutes:**

15 U.S.C. § 78o(k)(1) ..............................................................................................13

26 U.S.C. § 4975(e)(1)..........................................................................................6, 10

26 U.S.C. § 4975(e)(3)(B) ...............................................................................................5

29 U.S.C. § 1002(3) ......................................................................................................6, 10

29 U.S.C. § 1002(21)(A)(ii) ...........................................................................................5

29 U.S.C. § 1104(a)(1)(A) ..............................................................................................10

29 U.S.C. § 1104(a)(1)(B) ..............................................................................................10

29 U.S.C. § 1106(b)(3) ...................................................................................................10

29 U.S.C. § 1108(a) ........................................................................................................10

29 U.S.C. § 1108(b) ........................................................................................................10

29 U.S.C. § 1135.............................................................................................................10

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
203, 124 Stat. 1376 (2010):

§ 913(f), 124 Stat. 1827-1828 ...............................................................................13

§ 913(g), 124 Stat. 1828 ........................................................................................13

**Administrative Materials:**

40 Fed. Reg. 50,840 (Oct. 31, 1975).............................................................................6

40 Fed. Reg. 50,842 (Oct. 31, 1975).............................................................................6

75 Fed. Reg. 65,263 (Oct. 22, 2010).............................................................................4

Amendment to Prohibited Transaction Exemption 2020-02, 89 Fed. Reg. 32,260
(Apr. 25, 2024)........................................................................................................2, 11

Amendment to Prohibited Transaction Exemption 84-24, 89 Fed. Reg. 32,302
(Apr. 25, 2024)........................................................................................................3

Amendment to Prohibited Transaction Exemptions 75-1, 77-4, 80-83, 83-1, and
86-128, 89 Fed. Reg. 32,346 (Apr. 25, 2024)........................................................3

DOL, *New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment
Advice for Workers & Retirees Frequently Asked Questions* (Apr. 2021),
https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-
center/faqs/new-fiduciary-advice-exemption ........................................................4

Prohibited Transaction Exemption 2020-02, Improving Investment Advice for
Workers and Retirees, 85 Fed. Reg. 82,798 (Dec. 18, 2020) ...............................11, 12

Proposed Rule, Retirement Security Rule: Definition of an Investment Advice Fiduciary, 88 Fed. Reg. 75,890 (Nov. 3, 2023) ..................................................................9

Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318 (July 12, 2019) ......................................................................5, 14, 15, 17, 20, 21

Retirement Security Rule: Definition of an Investment Advice Fiduciary, 89 Fed. Reg. 32,122 (Apr. 25, 2024) .................................................2, 7, 8, 9, 10, 11, 15, 16

SEC, *Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors* (modified Jan. 23, 2024), https://www.sec.gov/tm/iabd-staff-bulletin ...................................................14

**Other Authorities:**

Chubb, *Excessive Litigation Over Excessive Plan Fees In 2023* (Apr. 2023), https://bit.ly/433OJ6V.........................................................................................................5

Deloitte, *The DOL Fiduciary Rule: A Study on How Financial Institutions Have Responded and the Resulting Impacts on Retirement Investors* (Aug. 9, 2017), https://bit.ly/3UWAKw8.................................................................................................19

Letter from Dorothy M. Donohue, Gen. Counsel, Inv. Co. Inst., to Jay Clayton, Chairman, SEC (Aug. 7, 2017), https://bit.ly/4bXFAjA .........................................20

Letter from Richard Foster, Fin. Servs. Roundtable, to Jay Clayton, SEC (Oct. 17, 2017), https://bit.ly/3X0N5BZ...................................................................................20

National Association of Insurance Commissioners, Suitability in Annuity Transactions Model Regulation (Spring 2020), https://bit.ly/3yzRotR ...................................16

NERA Economic Consulting, Comment on the Department of Labor Proposal and Regulatory Impact Analysis (July 17, 2015), https://bit.ly/4bw55IZ ......................................20

Richard Satran, *US Regulators Step Up Reg BI Enforcement Sharply as Individuals & Firms Increasingly Face Large Fines*, Thompson Reuters (Dec. 14, 2023), https://tmsnrt.rs/4aHDWRZ ........................................................................15, 16

Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg L. (Oct. 18, 2021), https://bit.ly/307mOHg ...........................................5

Michael Wursthorn, *A Complete List of Brokers and Their Approach to 'The Fiduciary Rule'*, Wall St. J. (Feb. 6, 2017), https://on.wsj.com/3KqAssI ...............................19

**INTEREST OF THE AMICUS CURIAE**

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country.[1]  Given the importance of the laws governing fiduciary conduct to its members, many of which maintain or provide services to retirement plans, the Chamber regularly participates as amicus curiae in ERISA cases at all levels of the federal-court system and successfully challenged the previous iteration of the regulation at issue as a party litigant.  *See Chamber of Commerce of United States of America v. U.S. Department of Labor*, 885 F.3d 360 (5th Cir. 2018).  The Chamber submits this brief to provide context regarding ERISA's statutory structure, to offer information about regulatory developments within other agencies that demonstrate how far the Department of Labor (DOL) has veered beyond its statutory authority, and to highlight the harm that DOL's regulation will cause to retirement investors if it is not set aside by the Court.

**INTRODUCTION**

The fiduciary duties of prudence and loyalty are "the highest known to the law." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020) (quotation omitted).  Congress took great care in assigning these duties under the Employee Retirement Income Security Act of 1974 (ERISA), codifying the common-law understanding of when these duties are owed and when they are not.  In Title I of ERISA, Congress enacted requirements governing employer-sponsored retirement and welfare-benefit plans.  Congress imposed the

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than Amicus, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

quintessential fiduciary duties of prudence and loyalty on those who serve as fiduciaries to these plans because they have authority over funds held in trust for other people.  Further, Title I provided DOL with expansive authority to regulate these plans and their fiduciaries, and provided a private right of action for participants and beneficiaries in Title I plans to sue in the event of a fiduciary breach.

In contrast with employer-sponsored retirement plans, individual savings vehicles (such as individual retirement accounts or individual retirement annuities, known collectively as IRAs), are not governed by Title I of ERISA.  Investments in IRAs are subject to substantive requirements found in state law and other federal statutes that govern investment products.  They are also subject to Title II of ERISA, which amended the Internal Revenue Code and created requirements for plans to qualify for federal income tax deferrals and deductions.  But when enacting Title II, Congress notably did not impose duties of prudence and loyalty with respect to individual savings vehicles; it did not provide DOL with the kind of wide-ranging regulatory authority afforded by Title I; and it did not provide a private right of action.

This case is the consequence of DOL's dissatisfaction with Congress's design.  When ERISA was enacted, IRAs were included to provide a tax-deferred savings vehicle for individuals not covered by employer-governed plans.  In the years immediately following 1974, consumer participation in IRAs was negligible.  But now that IRAs are commonplace, DOL has searched for a way to do what Congress did *not* do when ERISA was enacted and has never done since:  extend Title I duties to Title II plans.  The result is this rulemaking package, which consists of several related rules that this brief collectively calls the "Rule," except where necessary to differentiate

between them.[2]   DOL adopted a two-step strategy in its rulemaking:  First, it expanded the definition of a "fiduciary" in both Title I and Title II beyond the well-established common-law meaning by jettisoning a regulatory definition that has been in place for almost 50 years.  This redefinition swept in many brokers and insurance agents of Title II plans.  Once swept in as ERISA fiduciaries, the receipt of compensation by these brokers or insurance agents of Title II plans became presumptively unlawful as "prohibited transactions" under ERISA.  This paved the way for the second step, in which DOL created regulatory "exemptions" to the "prohibited transactions" that the agency effectively created through its overly expansive fiduciary definition.  But there is a catch:  These new exemptions are conditioned on (1) adhering to the fiduciary duties of prudence and loyalty found only in Title I of ERISA, and (2) acknowledging one's status as an ERISA fiduciary in writing.  By now forcing many brokers and agents into fiduciary status and only allowing compensation if they effectively adhere to Title I of ERISA, DOL has engineered a workaround to impose duties that Congress declined to impose.[3]

This is not DOL's first attempt to bypass the relevant statutory limitations.  When it promulgated a similar two-step regulation in 2016, the Chamber and others filed suit and the Fifth Circuit vacated the rule.  *See Chamber of Commerce of U.S. of Am. v. U.S. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) ("*Chamber*").  Although there are some differences between this Rule

---

[2] Retirement Security Rule: Definition of an Investment Advice Fiduciary, 89 Fed. Reg. 32,122 (Apr. 25, 2024); Amendment to Prohibited Transaction Exemption 2020-02, 89 Fed. Reg. 32,260 (Apr. 25, 2024); Amendment to Prohibited Transaction Exemption 84-24, 89 Fed. Reg. 32,302 (Apr. 25, 2024); and Amendment to Prohibited Transaction Exemptions 75-1, 77-4, 80-83, 83-1, and 86-128, 89 Fed. Reg. 32,346 (Apr. 25, 2024).  Although Plaintiffs challenge only two of these regulations, the arguments in this brief apply to the entire regulatory package.

[3] This amicus brief does not address the requirements of these exemptions—Prohibited Transaction Exemptions ("PTE") 2020-02 and 84-24—as applied to actual fiduciary conduct.  Instead, the Chamber addresses the breadth of the new definition of fiduciary investment advice, and the resulting problems that arise because the exemptions must be used in connection with interactions that should not be deemed fiduciary in the first place.

3

and the prior iteration, many of the defects identified by the Fifth Circuit are reprised in this Rule. Most saliently, the Rule dispenses with DOL's definition of an ERISA fiduciary that has been operative since 1975—the same year ERISA went into effect—including the requirement that the adviser  provide advice to the client on a "regular basis."  But the Fifth Circuit specifically held that "[t]he 1975 regulation captured the essence of a fiduciary relationship" and that, as used in ERISA, fee-based "investment advice" requires "a substantial, *ongoing* relationship between adviser and client."  *Id.* at 365, 375 (emphasis added).  DOL's latest attempt to redefine fiduciary status to include "one-time advice" not made in the context of a substantial, ongoing relationship of trust and confidence is just as contrary to the governing statute as its previous attempt in 2016.[4]

The Fifth Circuit also faulted the prior regulation for trespassing on "turf" that Congress had pointedly assigned to other regulators, namely the Securities and Exchange Commission (SEC) and the States.  This Rule crosses that same line, and this incursion is, if anything, more egregious given regulatory developments since the Fifth Circuit's decision.  In 2019, for instance, the SEC promulgated Regulation Best Interest (Reg BI), which overlaps to a large extent with the DOL's Rule.  Industry largely supported Reg BI and did not challenge it in court.  Reg BI requires brokers and dealers to put their clients' best interests first, including when making recommendations to retirement investors.  But the SEC specifically declined to impose full

---

[4] This is actually DOL's *fourth* attempt to impermissibly eliminate or redefine the "regular basis" test.  The now-vacated 2016 regulation was preceded in 2010 by a proposed regulation that was heavily criticized and never finalized.  *See* 75 Fed. Reg. 65,263 (Oct. 22, 2010).  In 2021, DOL issued informal guidance (in FAQ 7) that expanded the "regular basis" prong vis-à-vis rollovers from Title I plans to IRAs.  *See* DOL, *New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment Advice for Workers & Retirees Frequently Asked Questions* (Apr. 2021), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/new-fiduciary-advice-exemption.  That guidance has since been vacated.  *See Am. Securities Ass'n, v. U.S. Dep't of Labor*, No. 8:22-cv-330-VMC-CPT, 2023 WL 1967573, at \*22-23 (M.D. Fla. Feb. 13, 2023).

fiduciary status on brokers and dealers because it recognized the serious adverse market consequences that would result.

If DOL's Rule goes into effect, harm to individual investors is not merely likely, but certain. As the SEC found, the previous DOL fiduciary rule led to "a significant reduction in retail investor access to brokerage services" and "the available alternative services were higher priced in many circumstances." Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318, 33,322 (July 12, 2019). That is because financial services providers that were not previously treated as fiduciaries will bear significant compliance costs and an increased risk of expensive class-action litigation.[5] Brokers and insurance agents will inevitably pass on these costs to customers—or, daunted by this prospect, will simply transition to a model of offering full-service investment advice in exchange for asset-based compensation. That model is frequently too expensive for retail investors. In the end, many investors will pay more for financial services or have to do without, thereby forgoing the benefit of expert guidance.

This Court should stay the effective date and preliminarily enjoin the Rule.

## ARGUMENT

ERISA is "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Courts must always interpret its provisions to honor "the balance between [the] competing goals that … Congress has struck." *Id.* at 263.

---

[5] Indeed, class-action ERISA litigation has already been surging, resulting in significant costs to ERISA plans and fiduciaries. *See, e.g.*, Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg L. (Oct. 18, 2021), https://bit.ly/307mOHg ("A sharp spike in lawsuits over retirement plan fees has wreaked havoc on the market for fiduciary liability insurance…."); Chubb, *Excessive Litigation Over Excessive Plan Fees In 2023* (Apr. 2023), https://bit.ly/433OJ6V.

Under both Title I and Title II of ERISA, "a person is a fiduciary with respect to a plan to the extent ... he renders investment advice for a fee or other compensation, direct or indirect," regarding a plan's property.  29 U.S.C. § 1002(21)(A)(ii); 26 U.S.C. § 4975(e)(3)(B).  A Title I "plan" is limited to employer-sponsored benefit plans (*e.g.*, a pension plan or a 401(k) retirement plan), 29 U.S.C. § 1002(3), while a Title II "plan" also includes individual savings vehicles like IRAs, 26 U.S.C. § 4975(e)(1).  In 1975, shortly after ERISA was enacted, the Labor and Treasury Departments each promulgated a five-part test to define the term "investment advice for a fee" in the context of Title I and Title II plans.  *See* 40 Fed. Reg. 50,842 (Oct. 31, 1975) (Department of Labor regulation, interpreting an investment-advice fiduciary as set forth in Title I); 40 Fed. Reg. 50,840 (Oct. 31, 1975) (Department of Treasury regulation, interpreting an investment-advice fiduciary as set forth in Title II).  "Under that test, an investment-advice fiduciary is a person who (1) 'renders advice … or makes recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property;' (2) 'on a regular basis;' (3) 'pursuant to a mutual agreement ... between such person and the plan;' and the advice (4) 'serve[s] as a primary basis for investment decisions with respect to plan assets;' and (5) is 'individualized ... based on the particular needs of the plan.'"  *Chamber*, 885 F.3d at 364-365 (alterations and omissions in original) (citation omitted).

DOL's latest rulemaking marks a fundamental break from the 1975 test, most critically by eliminating the "on a regular basis" criterion for fiduciary status that the Fifth Circuit previously deemed critical, and by ignoring a critical distinction the statute draws between Title I and Title II plans: codifying the common law, Congress imposed the duties of prudence and loyalty only on Title I plans and not Title II plans. This new Rule is in direct conflict with ERISA and the Fifth Circuit's *Chamber* decision—which struck down a very similar regulation just six years ago.  And

6

the Rule will cause significant harm to retirement investors by making basic financial services more expensive, and less readily available, due to the cost of increased regulatory burdens and litigation risks that will be passed on to customers.

## I.    The Rule cannot be reconciled with ERISA's text and structure, or with Fifth Circuit precedent.

DOL's new Rule replicates several of the flaws that the Fifth Circuit's *Chamber* decision identified in the prior iteration of the regulation.  The Chamber focuses here on a few of the most glaring and significant conflicts with the statute and binding precedent, each of which requires vacatur of the Rule.

### A.    The Rule's expansive definition of fiduciary defies the common law meaning that ERISA incorporated.

In invalidating the prior rulemaking, the Fifth Circuit explained that "[t]he 1975 regulation captured the essence of a fiduciary relationship known to the common law as a special relationship of trust and confidence between the fiduciary and his client," and unambiguously held that ERISA "incorporat[ed]" this "well-settled meaning."  *Chamber*, 885 F.3d at 365, 370-372 (citation omitted).  In particular, the Fifth Circuit held that, as used in ERISA, fiduciary "investment advice" requires "a substantial, *ongoing* relationship between adviser and client," which DOL's 1975 regulation had incorporated by limiting ERISA fiduciary status to those who rendered individualized investment advice "on a regular basis."  *Id.* at 374-375 (emphasis added).  When DOL attempted to remove that limitation, and omit the "regular basis" criterion, the Fifth Circuit rejected it, holding that such an approach "fatally conflicts with the statutory text and contemporary understandings."  *Id.* at 376.

Despite the Fifth Circuit's clear holding that the "regular basis" prong is part of the "essence of the fiduciary relationship" incorporated into ERISA's investment-advice fiduciary provision, DOL has yet again done away with it—brazenly contending that the "regular basis"

7

requirement "finds no support in the statutory text of ERISA." 89 Fed. Reg. at 32,179-32,180.

Indeed, the Rule even contradicts one of the key examples used by the Fifth Circuit to describe a

transaction that unquestionably *could not* be deemed fiduciary investment advice: "one-time IRA

rollover or annuity transactions where it is ordinarily inconceivable that financial salespeople or

insurance agents will have an intimate relationship of trust and confidence with prospective

purchasers." *Chamber*, 885 F.3d at 380.  Ignoring this unambiguous language from the Fifth

Circuit's opinion, the Rule touts one-time "advice on whether to roll over … retirement savings

… to purchase an annuity" as a paradigmatic example of advice that may fall within the Rule's

definition of fiduciary because, DOL asserts, the "regular basis" requirement "is not a sensible

way to draw distinctions in fiduciary status." 89 Fed. Reg. at 32,179-32,180; *see id.* at 32,186

(explaining that the Rule is intended to cover "one-time advice to roll investments into an IRA").

The Rule thus directly conflicts with the common law meaning of fiduciary that ERISA

incorporates, as elucidated by the Fifth Circuit in its controlling 2018 decision.[6]

Moreover, DOL's reason for once again doing away with a criterion that the Fifth Circuit

found so critical finds no support in ERISA's text or structure, much less in the 1975 common-law

---

[6] DOL pays lip service to the Fifth Circuit decision by providing that the regular basis test is met if a person "makes professional investment recommendations to investors on a regular basis." 89 Fed. Reg. at 32,141.  This interpretation distorts what the "regular basis" test actually requires. First, the interpretation ignores that the regular basis test has never been predicated on holding oneself out *to the public generally*.  To do so would ignore the requirement of a relationship of trust and confidence between the individual giving the advice and the individual receiving it. Furthermore, under this broad reading, anyone who gives any investment advice as part of their business, regardless of whether the advice is for retirement assets in either a Title I or Title II plan per se, would seem to meet this prong.  Second, the 1975 regulation examined whether advice was given "on a 'regular basis' *with respect to plan assets*," *id.* at 32,179 (emphasis added), which requires that there be an actual relationship between the provider of advice and the plan.  That plainly would not have been satisfied by simply making investment recommendations to investors generally, without any requirement that the provider have a relationship with the retirement investor.

landscape that Congress incorporated.  DOL contends "that the 1975 regulation's regular basis test has served to defeat objective understandings of the nature of the professional relationship" because "even a discrete instance of advice can be of critical importance to the plan."  89 Fed. Reg. at 32,136.  It is unclear where, precisely, DOL has found these "objective understandings." It was not found in the statute's text or any contemporaneous understanding of the term "fiduciary" when Congress enacted ERISA.  Instead, DOL appears to have found inspiration for this change in the passage of time—DOL explained that "developments in retirement savings vehicles and in the investment advice marketplace have altered the way retirement investors interact with investment advice providers," including the proliferation of IRAs, which "were not major market participants" in 1975.  Proposed Rule, Retirement Security Rule: Definition of an Investment Advice Fiduciary, 88 Fed. Reg. 75,890, 75,899 (Nov. 3, 2023).  Accordingly, DOL came to the conclusion that "the 1975 test" "is underinclusive" based on "[t]he Department's experience in the current marketplace."  *Id.*; 89 Fed. Reg. at 32,132 (citing this discussion from the proposed rule to explain DOL's decision to amputate the "regular basis" criterion from the agency's interpretation of an investment-advice fiduciary).  This may be a sound reason for Congress to engage in legislative factfinding and craft a legislative solution to the extent Congress has these same concerns, but it does not permit a federal agency to dramatically redefine a statutory term that had a "well-settled meaning" when ERISA was enacted.  *Chamber*, 885 F.3d at 371.

The Fifth Circuit also held that the "statutory language" implicitly adopts an "important distinction" between investment advisers and brokers or insurance agents: "investment advisers" are "considered fiduciaries" while "stockbrokers and insurance agents … generally assume[] no such status."  *Id.* at 372-373.  This is because "[s]tockbrokers and insurance agents are compensated only for completed sales …, not on the basis of their pitch to the client.  Investment

9

advisers, on the other hand, are paid fees because they 'render advice.'" *Id.* at 373.  The Rule, as construed by DOL, obliterates this crucial distinction by lumping some ordinary practices of brokers and insurance agents together with investment advice under the same fiduciary rubric; indeed, DOL says that the Rule is meant to encompass conduct "commonly" performed by broker-dealers and insurance agents.  89 Fed. Reg. at 32,125.  This, too, contradicts the Fifth Circuit's *Chamber* decision, which held that ERISA "preserves this important distinction."  885 F.3d at 373.

**B.   DOL impermissibly collapsed the distinction between the fiduciary duties imposed by Titles I and II of ERISA.**

The Rule conflicts with ERISA and the *Chamber* decision in another key respect:  DOL has again devised a scheme to copy-and-paste the fiduciary duties imposed by ERISA Title I into the Title II context, even though Congress deliberately refrained from imposing those duties on fiduciaries to Title II plans and denied DOL such regulatory authority.  Therefore, the Rule once again "impermissibly conflates the basic division drawn by ERISA."  *Chamber*, 885 F.3d at 381.

"Title I of ERISA confers on the DOL far-reaching regulatory authority over employer- or union-sponsored retirement and welfare benefit plans."  *Id.* at 364 (citing 29 U.S.C. §§ 1108(a)-(b), 1135).  "A 'fiduciary' to a Title I plan is subject to duties of loyalty and prudence," in addition to a bar on various enumerated "prohibited transactions."  *Id.* (citing 29 U.S.C. §§ 1104(a)(1)(A)-(B), 1106(b)(3)).  These duties are enforced through lawsuits by DOL and by private plan participants or beneficiaries.  *See id.*

Title II of ERISA works differently.  Whereas a "plan" under Title I is limited to employer- or union-sponsored retirement plans and health plans, 29 U.S.C. § 1002(3), a "plan" under Title II includes tax-deferred individual savings vehicles like IRAs, 26 U.S.C. § 4975(e)(1).  But while Congress included IRAs within Title II, Congress "did not authorize DOL to supervise financial service providers to IRAs in parallel with its power over ERISA plans."  *Chamber*, 885 F.3d at

10

364.  Importantly, "fiduciaries to IRAs are not, unlike ERISA plan fiduciaries, subject to statutory duties of loyalty and prudence."  *Id.*  Rather, they are subject only to the prohibited-transaction provisions that appear in both Title I and Title II.  Enforcement of these provisions is assigned to the Treasury Department, not to DOL or private plaintiffs (*i.e.*, IRA investors).  *See id.* at 364.

As with the prior version invalidated in 2018, one of the chief catalysts of this Rule was DOL's assessment that "the use of participant-directed IRA plans has mushroomed as a vehicle for retirement savings," *id.* at 365.  DOL remains unsatisfied that financial professionals who render services regarding IRA investments "have no legal obligation to adhere to the fiduciary standards in Title I of ERISA"—*i.e.*, the fiduciary duties of loyalty and prudence.  89 Fed. Reg. at 32,124.  But DOL still lacks authority to add fiduciary duties beyond those conferred by the statute.

DOL's solution was to grant itself authority to impose fiduciary duties through legal gymnastics.  First, it greatly expanded the definition of "fiduciary" for both Titles I and II so that ordinary brokers and insurance agents are swept in even though their sales do not occur in the context of a relationship of trust and confidence.  Second, because that fiduciary status triggers a bar on compensation of advisers and brokers under the "prohibited transactions" provisions, DOL exploited its power to create exemptions to the prohibited transactions by making PTE 2020-02 and 84-24 available *only if* the advisers and brokers adhere to the Title I fiduciary "standards of prudence and loyalty,"  89 Fed. Reg. at 32,267-32,268, and only if those subject to the exemptions "acknowledge their fiduciary status" under ERISA "in writing."  89 Fed. Reg. at 32,261 & n.17. Thus, DOL has used perhaps the most powerful stick in the agency's arsenal—denial of compensation for services rendered—to impose ERISA's Title I fiduciary duties of prudence and

loyalty on Title II plans despite Congress's contrary statutory design.[7]

This is substantively no different from what DOL attempted to do in the previous regulation—and what the Fifth Circuit rejected.  The Fifth Circuit noted that, while "ERISA plan fiduciaries must adhere to the traditional common law duties of loyalty and prudence in fulfilling their functions, … IRA plan 'fiduciaries' … are not saddled with these duties."  *Chamber*, 885 F.3d at 381.  Yet, "[d]espite the differences between ERISA Title I and II, DOL is treating IRA financial services providers in tandem with ERISA employer-sponsored plan fiduciaries," which "impermissibly conflates the basic division drawn by ERISA."  *Id.*; *see also, e.g.*, *Babb v. Wilkie*, 589 U.S. 399, 412 (2020) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and citation omitted)).  The current iteration suffers from the same flaw.

### C.    The Rule intrudes on turf that Congress assigned to other regulators.

The Fifth Circuit also held that the 2016 regulation "conflict[ed]" with Congress's efforts in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and faulted DOL for "occupying the Dodd-Frank turf" by seeking "to secure further oversight of broker/dealers handling IRA investments and the sale of fixed-indexed annuities."  *Chamber*, 885 F.3d at 385-386.  These problems are likewise present in the current Rule—in fact, subsequent developments

---

[7] DOL downplayed the impact of applying this fiduciary standard by reference to the prior version of 2020-02, which it said already imposed a similar "impartial conduct standard" on fiduciaries of IRAs.  89 Fed. Reg. at 32,267 (citing Prohibited Transaction Exemption 2020-02, Improving Investment Advice for Workers and Retirees, 85 Fed. Reg. 82,798 (Dec. 18, 2020)).  But the 2020 PTE downplayed concerns about *its* scope by pointing to the fact that, as a result of the Fifth Circuit's vacatur of the 2016 fiduciary rule, the PTE applied only to those "already deemed to be fiduciaries within the meaning of the [1975] five-part test" and not to a broader category of plans. 85 Fed. Reg. at 82,822.  DOL's circular logic does not withstand scrutiny.

have aggravated the conflict with Dodd-Frank.

      **1.   The SEC's authority and Regulation Best Interest.**

With respect to broker-dealers, the Fifth Circuit noted that Dodd-Frank specifically authorized "the SEC to promulgate enhanced, uniform standards of conduct for broker-dealers and investment advisers who render 'personalized investment advice about securities to a retail customer'" while flatly "prohibit[ing] SEC from eliminating broker-dealers' 'commissions or other standard compensation.'" *Id.* at 385 (alteration and citations omitted). Yet, "[b]y presumptively outlawing transaction-based compensation as 'conflicted,'" DOL's regulation "undercut[] the Dodd-Frank provision that instructed SEC not to prohibit such standard forms of broker-dealers' compensation." *Id.* at 386. Moreover, the Fifth Circuit explained that "[t]he SEC has the expertise and authority to regulate brokers and dealers uniformly," whereas "DOL has no such statutory warrant" but is limited to the retirement context. *Id.* at 385. As discussed above, the current Rule similarly transforms the standard transaction-based compensation of broker-dealers into presumptively unlawful prohibited transactions, insofar as DOL would now sweep them into the new definition of fiduciary. *See* pp. 9-10, *supra*. That undercuts Dodd-Frank's command, as the Fifth Circuit explained.

DOL's new Rule also "infring[es] on SEC turf" no less than the prior one. *Chamber*, 885 F.3d at 385-386. Consider Dodd-Frank's authorization to the SEC to "commence a rulemaking … to address the legal or regulatory standards of care for brokers, dealers, [and] investment advisers … for providing personalized investment advice about securities to … retail customers." Pub. L. No. 111-203, § 913(f), 124 Stat. 1827-1828 (2010). In a subsection entitled "Authority to Establish a Fiduciary Duty for Brokers and Dealers," Congress expressly empowered the SEC, should the agency deem it appropriate, to impose fiduciary status "with respect to a broker or dealer, when providing personalized investment advice about securities to a retail customer." *Id.*

13

§ 913(g), 124 Stat. at 1828 (codified in part at 15 U.S.C. § 78o(k)(1)).  ERISA, of course, does not give DOL similar authorization.  Instead, ERISA's text carefully *distinguishes* brokers and dealers from fiduciaries, as the Fifth Circuit previously held.  *See* pp. 9-10, *supra*.

In 2019, after the *Chamber* decision, the SEC acted on this statutory authority and promulgated Reg BI.  *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33,318 (July 12, 2019).  The SEC adopted a "best interest" standard of conduct for broker-dealers, which is "similar to key elements of the fiduciary standard for investment advisers."  *Id.* at 33,321.[8]  Yet, critically, the SEC "declined to subject broker-dealers to a wholesale and complete application of the existing fiduciary standard under [the Investment Advisers Act of 1940] because it is not appropriately tailored to the structure and characteristics of the broker-dealer business model."  *Id.* at 33,322.  The SEC emphasized that it "believe[d] (and [its] experience indicate[d]) that this approach would significantly reduce retail investor access to differing types of investment services and products, reduce retail investor choice in how to pay for those products and services, and increase costs for retail investors obtaining investment recommendations."  *Id.*  Indeed, the SEC specifically pointed to "the now vacated [DOL] Fiduciary Rule" as a cautionary tale, explaining that its adoption led to "a significant reduction in retail investor access to brokerage services, and [the SEC] believe[d] that the available alternative services were higher priced in many circumstances."  *Id.* (footnotes omitted).

Reg BI covers much of the same ground as the DOL Rule.  It encompasses

---

[8] Indeed, the SEC has explained that "[a]lthough the specific application of Reg BI and the [Investment Advisers Act] fiduciary standard may differ in some respects and be triggered at different times, … they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."  SEC, *Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Account Recommendations for Retail Investors* (modified Jan. 23, 2024), https://www.sec.gov/tm/iabd-staff-bulletin.

14

recommendations to plan participants about their retirement accounts, including "IRAs and individual accounts in workplace retirement plans, such as 401(k) plans and other tax-favored retirement plans," and specifically encompasses "recommendations to roll over or transfer assets into an IRA." *Id.* at 33339, 33343.  In other words, Reg BI already protects the kind of "inexpert customers" seeking assistance with their retirement investments who are the primary focus of DOL's Rule.  *See* 89 Fed. Reg. at 32,180-32,181; *see id.* at 32,179 (discussing the need to protect "a plan participant [who] seeks advice on whether to roll over all their retirement savings, representing a lifetime of work," when "the plan participant has no investment expertise whatsoever").  Industry did not challenge Reg BI in court,[9] and the SEC and the Financial Industry Regulatory Authority (FINRA) have made clear that the regulation will be vigorously enforced. *See, e.g.*, Richard Satran, *US Regulators Step Up Reg BI Enforcement Sharply as Individuals & Firms Increasingly Face Large Fines*, Thompson Reuters (Dec. 14, 2023), https://tmsnrt.rs/4aHDWRZ.  In these circumstances, the DOL Rule impermissibly encroaches on the SEC's turf, which is underscored by the fact that the SEC expressly considered and rejected as harmful to investors DOL's approach of treating broker-dealers as fiduciaries.

### 2.  State authority to regulate insurance agents.

The other aspect of Dodd-Frank's "turf" that the Fifth Circuit identified was the regulation of fixed annuities sold by insurance agents.  "In Dodd-Frank," the court noted, "Congress opted to defer such regulation to the states, which have traditionally and under federal law borne responsibility for thoroughgoing supervision of the insurance business."  *Chamber*, 885 F.3d at 385; *see also* 89 Fed. Reg. at 32,213 ("While variable annuities and some indexed annuities are

---

[9] Some organizations and States challenged Reg BI on the ground that the SEC should have imposed a fiduciary standard on broker-dealers, but that challenge was rejected.  *See XY Planning Network, LLC v. SEC*, 963 F.3d 244 (2d Cir. 2020).

considered securities, such that their sale is subject to SEC and FINRA regulation, the standard of care owed to a customer for other types of annuities [*e.g.*, fixed annuities] depends on the State regulation." (footnote omitted)).

In recent years, the States have answered Congress's call.  Forty-five States thus far have adopted a version of the 2020 Model Regulation issued by the National Association of Insurance Commissioners (NAIC).[10]  As DOL has recognized, this regulation provides "that insurance agents must act in the consumer's best interest, as defined by the Model Regulation, when making a recommendation of an annuity."  89 Fed. Reg. at 32,125.

Yet DOL asserts that the States have not gone far enough, because "the NAIC Model Regulation … does not protect retirement investors to the same degree as the fiduciary protections in Title I and Title II of ERISA."  *Id.* at 32139.  For example, the NAIC Model Regulation takes care to point out that it does *not* impose a fiduciary obligation.  *See* NAIC Model Regulation §§ 1.B, 6.A(1)(d).  It also does not treat a commission or other transaction-based fees as a "material conflict of interest" that must be mitigated, and the standard of care is somewhat different than the "best interest" standard adopted by the SEC or the fiduciary standard adopted by DOL.  *See* 89 Fed. Reg. at 32,129-32,130.  But, as the Fifth Circuit noted, DOL's complaints really lie with Congress: "While Congress exhibited confidence in the states' insurance regulation, DOL criticizes the Dodd-Frank provisions as 'insufficient' to protect the 'subset' of retirement-related fixed-indexed annuities transactions within DOL's purview."  *Chamber*, 885 F.3d at 386.  Once again, "DOL is occupying the Dodd-Frank turf"—without statutory permission.  *Id.*

## II.    This Rule will significantly harm investors by making important financial services more costly and less available.

---

[10]   *See* NAIC, Suitability in Annuity Transactions Model Regulation (Spring 2020), https://bit.ly/3yzRotR; 89 Fed. Reg. at 32,192.

The economic effects of this Rule are no mystery. Studies have demonstrated, and the SEC has confirmed, that "[w]ith the adoption of the now vacated [2016 DOL] Fiduciary Rule, there was a significant reduction in retail investor access to brokerage services, and [the SEC] believe[s] that the available alternative services were higher priced in many circumstances." 84 Fed. Reg. at 33,322 (footnotes omitted). Indeed, these "concerns about the ramifications for investor access, choice, and cost" are the principal reason why the SEC declined to impose a full fiduciary standard on broker-dealers in Reg BI. *Id.* Considering the adverse consequences of the vacated DOL rule, the SEC stressed, its concerns "are not theoretical." *Id.*

Specifically, the SEC observed that, under the fiduciary standard long applied to investment advisers, "broker-dealers would face increased compliance costs resulting from having to conform their advice models to a regulatory regime that was not formed for a transaction-based model." *Id.* at 33,464. That "would result in fewer broker-dealers offering transaction-based services to retail customers," *id.* at 33,330, as broker-dealers sought to avoid those compliance costs by shifting to a fee-based advisory model, *id.* at 33,464. Imposing the investment adviser fiduciary duty on broker-dealers, the SEC found, would "significantly reduce retail investor access to differing types of investment services and products, reduce retail investor choice in how to pay for those products and services, and increase costs for retail investors of obtaining investment recommendations." *Id.* at 33,322 & n.31; *see id.* at 33,464-33,465.

The problem goes well beyond the cost of complying with the Rule. Even financial professionals and firms who are already adhering to fiduciary-like standards, because of Reg BI or for other reasons, face significant *new* and *greatly expanded* risks of legal liability under this Rule. Fiduciaries under Title I of ERISA can be (and frequently are) sued for alleged breaches of fiduciary duties by private plan participants or beneficiaries, including in enormous class actions.

17

The claims may lack merit, but there is a very real "possibility that 'a plaintiff with a largely groundless claim'" may pursue discovery as "an *in terrorem* increment of the settlement value." *PBGC ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Thus, entities that now find themselves potentially falling within DOL's new definition of fiduciary under Title I must add the risk of class-action litigation to the compliance costs and harm to investors that will naturally flow from the Rule.

Worse, the Rule has the added vice of designating the ordinary business of brokers and insurance agents as a "prohibited transaction" under ERISA, one that is presumptively unlawful absent a qualifying exemption.  Brokers and insurance agents may qualify for exemptions— particularly PTE 2020-02 or 84-24; however, that will not spare them from the threat of litigation by private parties, including class actions, whenever they provide services to Title I plans.  And in those lawsuits, "prohibited transaction" exemptions are generally deemed affirmative defenses for which *the defendant* bears the burden of proof.  *See Donovan v. Cunningham*, 716 F.2d 1455, 1467-1468 (5th Cir. 1983); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016) (collecting cases of other circuits holding the same).  Thus, in some jurisdictions a plaintiff may be able to state a claim for a prohibited transaction under ERISA, and survive a motion to dismiss, merely by pleading a *prima facie* prohibited transaction without even trying to negate any applicable exemptions.  *See, e.g.*, *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan ex rel. Lyon v. Buth*, 99 F.4th 928, 948 (7th Cir. 2024); *but see Cunningham v. Cornell Univ.*, 86 F.4th 961, 975 (2d Cir. 2023) (holding that ERISA's exemptions are "incorporated into" the statute's statutory prohibitions and therefore plaintiffs must plausibly allege that plainly relevant exemptions do not apply).  And even in jurisdictions that (correctly) require plaintiffs to plead that

18

relevant exemptions are inapplicable, the types of exemptive conditions incorporated by DOL here—which include the requirement that fiduciaries comply with the duties of prudence and loyalty—may be deemed too fact-dependent to be resolved at the pleading stage. Brokers, insurance agents, and other entities whom the Rule at least arguably deems fiduciaries therefore run the palpable risk of finding themselves sued, thrown into expensive discovery, and bearing the burden to prove that they have complied with the exemption's requirements—including the context-specific duties of prudence and loyalty. Plan sponsors run the same risk, because they may also be sued for causing the plan to engage in a prohibited transaction. That litigation risk places enormous pressure and costs on plan sponsors and financial service providers.

Moreover, brokers and insurance agents whom the Rule now designates as fiduciaries will likely be exposed to new litigation risk even when they make recommendations related to Title II investment vehicles, despite the fact that Title II does not contain a private right of action. That is because their newfound status as fiduciaries under ERISA—and the requirement that they acknowledge their fiduciary status *in writing*—will almost certainly be used by the plaintiffs' bar as a springboard for state-law claims, including breach of contract and breach of fiduciary duty. Importantly, Reg BI and the NAIC Model Regulation take pains not to impose such a broad fiduciary status, thereby heading off potential state-law claims for fiduciary breach. But DOL's Rule opens a new vista of litigation risks, even with respect to Title II plans.

The upshot is that the Rule will impose large burdens on financial professionals, who will in turn inevitably modify their services and pass on costs to the customers. The empirical evidence bears out these worries. One study showed that, in response to the 2016 DOL fiduciary rule, 53% of firms had reduced or eliminated access to transaction-based brokerage advice services, and 95% of firms reduced the type of products offered to retail investors. Deloitte, *The DOL Fiduciary*

19

*Rule: A Study on How Financial Institutions Have Responded and the Resulting Impacts on Retirement Investors*, at 5 (Aug. 9, 2017) ("Deloitte Study"), https://bit.ly/3UWAKw8.  Many brokerage firms announced various changes to their product and service offerings.  *See* Michael Wursthorn, *A Complete List of Brokers and Their Approach to 'The Fiduciary Rule'*, Wall St. J. (Feb. 6, 2017), https://on.wsj.com/3KqAssI.  These changes included "reduced product choice, a move to asset-based arrangements that may be more costly for buy-and-hold investors, and an increase in account minimums for commission-based accounts."  Letter from Dorothy M. Donohue, Gen. Counsel, Inv. Co. Inst., to Jay Clayton, Chairman, SEC, at 4 (Aug. 7, 2017), https://bit.ly/4bXFAjA.  More than half of firms reported that they would likely pass on increased compliance costs to their clients through higher fees.  *See* Letter from Richard Foster, Fin. Servs. Roundtable, to Jay Clayton, SEC, App. B, at 77 & tbl. 1 (Oct. 17, 2017) ("FSR Study"), https://bit.ly/3X0N5BZ ("Key Poll Findings—National Survey of Financial Professionals" (July 17, 2017)) (attachment beginning at p. 92 of the PDF document).

Investors with small account balances are almost ten times more likely to be affected by these changes than those with larger account balances.  84 Fed. Reg. at 33,423.  This is because many investors would be unable to pay for a fiduciary advisory-fee model rather than a transaction-fee model, and investors with limited investment assets often do not qualify for advisory accounts because they do not meet account minimums.  For example, if an investment adviser has a $25,000 minimum account balance (which is conservative), more than 40% of persons owning retail commission-based accounts would be unable to qualify. *See* NERA Economic Consulting, Comment on the Department of Labor Proposal and Regulatory Impact Analysis, at 9-12 (July 17, 2015), https://bit.ly/4bw55IZ.  If a firm has a $50,000 minimum, more than 57% of account-holders would be unable to open fee-based accounts.  *Id.* at 9.  Indeed, 68% of firms reported that

20

they were less likely to provide transaction-based advisory services to smaller accounts.  *See* FSR Study at 77.  And at least 29% of firms planned to move clients with low account balances, *i.e.*, less than $25,000, to robo-advisers.  *Id.*

Reducing access to financial planning assistance for retirement investors would cause significant harm.  The SEC highlighted several "academic studies of the benefits that investors may obtain from hiring financial professionals," including overcoming "investment mistakes." 84 Fed. Reg. at 33,425 & nn.1046-1048 (collecting studies).  These studies demonstrate that professional financial assistance helps investors minimize costly investment mistakes; allocate portfolios in a more diversified manner; minimize taxes; increase savings; and take advantage of economies of scale with respect to the cost of information.  *See id.*  All of those benefits would be lost to investors without affordable access to financial assistance.

21

## CONCLUSION

For the foregoing reasons, this Court should grant the motion to stay the Rule's effective date and to issue a preliminary injunction.

Dated: May 31, 2024

OF COUNSEL:

William M. Jay
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036

Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Kevin Palmer
Maria C. Monaghan
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Respectfully submitted,

*/s/ Kendyl T. Hanks*
Kendyl T. Hanks
GREENBERG TRAURIG LLP
Texas Bar No. 24032273
300 West 6th Street, Suite 2050
Austin, TX  78701
T: (512) 320-7200
F: (512) 320-7210
hanksk@gtlaw.com

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

22

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Texas by using the court's CM/ECF system on May 31, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: May 31, 2024

*/s/ Kendyl T. Hanks*
Kendyl T. Hanks

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

23