## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INC., et al., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:24-cv-163-JDK |
| UNITED STATES DEPARTMENT OF LABOR, et al., | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This case challenges the Department of Labor's new Rule broadly redefining the term "fiduciary" for purposes of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, *codified as amended at* 29 U.S.C. §§ 1001, *et seq*, and 26 U.S.C. § 4975. The Rule is not DOL's first attempt to expand the meaning of fiduciary under ERISA. The Fifth Circuit vacated an earlier, similar rule because it "conflict[ed] with the plain text of [ERISA]," was "inconsistent with the entirety of ERISA's 'fiduciary' definition," and unreasonably treated numerous financial services providers "in tandem with ERISA employer-sponsored plan fiduciaries." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 379, 381 (5th Cir. 2018).

The 2024 Fiduciary Rule suffers from many of the same problems. Plaintiffs are insurance agents who sell annuities and other products to clients rolling over their retirement investments from employer-provided plans (such as 401(k)s) into

IRAs. They argue that the 2024 Rule conflicts with ERISA by imposing ERISA-fiduciary status on "any insurance agent who merely complies with state insurance laws when dealing with an ERISA plan member or owner of an [IRA]." Docket No. 8 at 1. And complying with the Rule while this lawsuit is pending, they argue, will subject them to "significant compliance burdens, . . . potential liability under ERISA, and potential enforcement actions by DOL." *Id.* at 11. Plaintiffs therefore seek a stay of the Rule's September 23, 2024, effective date, or alternatively, a preliminary injunction enjoining DOL's enforcement of the Rule while this case proceeds. *Id.* at 30.

The Court grants Plaintiffs' motion. As explained below, Plaintiffs are likely to succeed on the merits of their claim because the 2024 Fiduciary Rule conflicts with ERISA in several ways, including by treating as fiduciaries those who engage in one-time recommendations to roll over assets from an ERISA plan to an IRA. DOL's related amendments to Prohibited Transaction Exemption 84-24 are also unreasonable and arbitrary and capricious. For its part, DOL attempts to reconcile the Rule to *Chamber* but fails. Ultimately, DOL contends that *Chamber* is wrong and unduly limits the agency's authority. But that is an argument for the *en banc* Fifth Circuit or the Supreme Court. The balance of the factors necessary to issue a stay, moreover, weigh in Plaintiffs' favor here.

Accordingly, the Court **ORDERS** that the effective date of the 2024 Fiduciary Rule and amended PTE 84-24 is **STAYED** until further order of the Court.

# I. FACTUAL BACKGROUND

Before analyzing the 2024 Fiduciary Rule, the Court sets forth the statutory framework and the history of DOL's rulemaking in this area.

## A. ERISA's Framework

"Congress passed ERISA in 1974 as a 'comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Chamber*, 885 F.3d at 363–64 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."). ERISA has two parts:  Title I, which governs employer-sponsored retirement plans, 29 U.S.C. §§ 1001, *et seq.*; and Title II, which governs individual retirement plans, *id.* §§ 1201, *et seq.*

"Title I of ERISA confers on the DOL far-reaching regulatory authority over employer- or union-sponsored retirement and welfare benefit plans." *Chamber*, 885 F.3d at 364.  Every Title I plan must "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).  Even if not named, a person may still be a fiduciary to a Title I plan if he "exercises any discretionary authority or discretionary control respecting management . . . [or] administration of such plan" or if he "renders investment advice for a fee or other compensation" to the plan.  *Id.* § 1002(21)(A).

Title I imposes stringent duties on fiduciaries, including that they act with loyalty and prudence.  *Id.* § 1104(a)(1).  As one court held, "the duties charged to an

ERISA fiduciary are the highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002) (cleaned up).  A fiduciary who breaches these duties is liable for losses to the plan.  *Id.* § 1109(a).  Even more, "ERISA authorizes lawsuits by the DOL, plan participants or beneficiaries" to remedy such breaches. *Chamber*, 885 F.3d at 364 (citing 29 U.S.C. § 1132(a)).  Title I also categorically prohibits fiduciaries from engaging in certain kinds of conflicted transactions; as relevant here, a fiduciary may not "receive[] a commission paid by a third party or compensation that varies based on the advice provided."  *Id.* (citing 29 U.S.C. § 1106(b)(3)); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (noting that § 1106 "bar[s] categorically a transaction that [is] likely to injure the pension plan" (citation omitted)).  In sum, being labeled a fiduciary under Title I imposes a heavy burden.  Title I also delegates to the Secretary of Labor the authority to "prescribe such regulations as he finds necessary or appropriate," including to "define accounting, technical and trade terms" used in Title I.  29 U.S.C. § 1135.

"Title II created tax-deferred personal IRAs and similar accounts within the Internal Revenue Code."  *Chamber*, 885 F.3d at 364 (citing I.R.C. § 4975(e)(1)(B)).[1] Title II is much more modest in scope than Title I:  it "d[oes] not authorize DOL to supervise financial service providers to IRAs in parallel with [the agency's] power over [Title I] plans," does not subject fiduciaries to duties of loyalty or prudence, and does not create a right of action—public or private—for redressing violations of its provisions.  *Id.*  Instead, Title II authorizes the Department of the Treasury and the

---

[1]  For simplicity's sake, the Court will refer to all Title II plans as IRAs.

Internal Revenue Service to impose excise taxes on certain prohibited transactions. I.R.C. § 4975(a), (b).   DOL may only grant exemptions from these prohibited transactions, *id.* § 4975(c)(2), and may "define accounting, technical and trade terms" used in the statute.  29 U.S.C. § 1135.[2]

> Titles I and II of ERISA adopt the same definition of "fiduciary:"
>
> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* § 1102(21)(A); *see also* I.R.C. § 4975(e)(3).   Only the second subsection— "render[ing] investment advice for a fee or other compensation"—is at issue here.  The fiduciary in this subsection is typically referred to as an "investment advice fiduciary."  *Chamber*, F.3d 885 at 363.

As noted above, fiduciaries are prohibited from engaging in certain transactions under both Titles.  29 U.S.C. 1106; I.R.C. § 4975(c).[3]  This includes receiving a commission from a sale.  *See* 29 U.S.C. § 1106(b)(3) ("A fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account

---

[2] Initially, the Secretary of the Treasury held the authority to grant exemptions under Title  II. In 1978, "[t]o harmonize [Title I and I's] administration and interpretation," President Carter issued an executive order transferring that authority to the Secretary of Labor.  Reorganization Plan No. 4 of 1978, 43 Fed. Reg. 47,713 (Oct. 17, 1978).  Congress ratified that decision in 1984. Pub. L. No. 98-532, 98 Stat. 2705 (1975) (codified at 29 U.S.C. § 1001 note).

[3] Because Title 29 and the Internal Revenue Code's provisions are identical on this point, the Court will cite only the former.

from any party dealing with such plan in connection with a transaction involving the assets of the plan."). However, fiduciaries can engage in otherwise-prohibited transactions if they meet the requirements of a "prohibited-transaction exemption" ("PTE"). *See id.* § 1108. ERISA enumerates several PTEs, *see id.* § 1108(b), and grants DOL the authority to issue administrative PTEs if the agency finds that "such exemption is (1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of such plan." *Id.* § 1108(a).

### B. 1975 Definition of Fiduciary

In 1975, one year after ERISA was passed, DOL issued a five-part conjunctive test defining when a person is an investment advice fiduciary. Definition of the Term 'Fiduciary', 40 Fed. Reg. 50,842 (Oct. 31, 1975) (codified at 29 C.F.R. part 2510.3-21) (the "1975 Definition"). DOL defined an investment advice fiduciary as

> a person who (1) renders advice or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; (2) on a regular basis; (3) pursuant to a mutual agreement between such person and the plan; and the advice (4) serves as a primary basis for investment decisions with respect to plan assets; and (5) is individualized based on the particular needs of the plan.

*Chamber*, F.3d 885 at 364–65 (quoting 29 C.F.R. § 2510.3-21(c)(1)) (cleaned up).

In 1984, DOL exercised its regulatory authority to issue administrative PTEs by creating PTE 84-24. Amendments to Class Exemption for Certain Transactions Involving Insurance Agents and Brokers, 49 Fed. Reg. 13,208 (Apr. 3, 1984). PTE 84-24 covered sales of insurance and annuity contracts and allowed for "customary sales commissions" if the terms of the contract (1) were "at least as

favorable as those at arm's-length," (2) "provided for reasonable compensation," and (3) "included certain disclosures." *Chamber*, 885 F.3d at 367 (quoting 49 Fed. Reg. at 13211).

### C. The 2016 Fiduciary Rule

"In the decades following the passage of ERISA, the use of participant-directed IRA plans [] mushroomed as a vehicle for retirement savings." *Id.* at 365. At the same time, "members of the baby-boom generation" began retiring and rolling over their Title I plans into IRAs. *Id.* These changes concerned DOL. As the agency explained, "ERISA's statutory fiduciary obligations of prudence and loyalty do not govern the fiduciaries of IRAs . . . [and] the sole statutory sanction [under Title II] for engaging in [] illegal transactions is the assessment of an excise tax enforced by the [IRS]." *Id.* (quotation omitted). Plus, DOL claimed that IRA investors were at a disadvantage because they "lack the sophistication and understanding of the financial marketplace possessed by investment professionals who manage ERISA employer-sponsored plans." *Id.* DOL also believed that the 1975 Definition failed to capture the full range of fiduciary activity because its "requir[ement] that the advice be given to the customer on a 'regular basis' and that it must also be the 'primary basis' for investment decisions . . . excluded one-time transactions like IRA rollovers." *Id.* In sum, the retirement investment market was changing drastically, and DOL believed it lacked the tools to regulate it.

So, "[b]eginning in 2010, DOL set out to fill the perceived gap." *Id.* at 366. In 2016, after a lengthy rulemaking process, DOL announced a new rule that "overhaul[ed] [] the investment advice fiduciary definition" and released

"amendments to six existing [PTEs] and two new [PTEs]." *Id.* at 366.  The Court will refer to this package as the 2016 Fiduciary Rule.  As relevant here, the Rule had three important parts.

First, the 2016 Fiduciary Rule redefined "investment advice fiduciary," eliminating the 1975 Definition's five-part test.  Definition of the Term "Fiduciary", 81 Fed. Reg. 20,946 (Apr. 8, 2016), *amended by* 82 Fed. Reg. 16,902 (April 7, 2017) (the "2016 Definition").  The 2016 Definition treated as an investment advice fiduciary anyone who "'renders investment advice for a fee' whenever he is compensated in connection with a 'recommendation as to the advisability of' buying, selling, or managing 'investment property.'"  *Chamber*, 885 F.3d at 366 (quoting 29 C.F.R. § 2510.3-21(a)(1) (2017)).  The 2016 Definition also required that the "'investment advice' [be] directed 'to a specific advice recipient . . . regarding the advisability of a particular investment or management decision with respect to' the recipient's investment property."  *Id.* (quoting 29 C.F.R. § 2510.3-21(a)(2)(iii) (2017)). "Critically, the [2016 Definition] dispense[d] with the 'regular basis' and 'primary basis' criteria" from the 1975 Definition.  *Id.*  DOL explained that the 2016 Definition was much broader than the 1975 version and could have covered "an individual or entity who is, among other things, a representative of a registered investment adviser, a bank or similar financial institution, an insurance company, or a broker-dealer." 81 Fed. Reg. at 20946 n.1.  "Unless they are fiduciaries, . . . these consultants and advisers are free under ERISA and the Code, not only to receive [] conflicted

compensation, but also to act on their conflicts of interest to the detriment of their customers." 81 Fed. Reg. at 20,956.

On the same day, DOL announced a major amendment to PTE 84-24. Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24, 81 Fed. Reg. 21,147 (Apr. 8, 2016), *corrected at* 81 Fed. Reg. 44,784 (July 11, 2016), *and amended by* 82 Fed. Reg. 16,902. The amendment changed PTE 84-24 in two important ways. First, to fall within the exemption, an insurance agent must abide by "Impartial Conduct Standards," such as the duties of loyalty and prudence. *Chamber*, 885 F.3d at 367. And second, PTE 84-24 no longer covered fixed rate annuities, one of the most common kind of annuities sold by insurance agents. *Id.*

Finally, DOL announced a new PTE called the Best Interest Contract Exemption ("BICE"). 81 Fed. Reg. 21,002 (Apr. 8, 2016), *corrected at* 81 Fed. Reg. 44,773 (July 11, 2016), *and amended by* 82 Fed. Reg. 16,902. DOL issued the BICE because it recognized that the 2016 Definition could "sweep in some relationships that are not appropriately regarded as fiduciary in nature and that [DOL] does not believe Congress intended to cover as fiduciary relationships." *Chamber*, 885 F.3d at 367 (quoting 81 Fed. Reg. at 20,948). The BICE supplanted former PTEs, imposing "a web of duties and legal vulnerabilities" on those who qualify. *Id.* For example, the BICE required that the adviser enter into a contract affirming his fiduciary status, incorporate the Impartial Conduct Standards mentioned above, avoid misleading statements, and charge no more than reasonable

compensation.  *Id.*  As the Fifth Circuit summarized, obtaining the BICE came "at a high price."  *Id.*

The 2016 Fiduciary Rule occupied 275 pages in the Federal Register and, by DOL's own estimate, would have imposed compliance costs ranging from $16.1 billion to $31.5 billion over a decade.  *Id.* at 366.  Accordingly, the 2016 Fiduciary Rule immediately "spawned significant market consequences, including the withdrawal of several major companies, including Metlife, AIG and Merrill Lynch from some segments of the brokerage and retirement investor market."  *Id.* at 368.  Other "[c]ompanies like Edward Jones and State Farm [] limited the investment products that can be sold to retirement investors."  *Id.*  And "[c]onfusion abound[ed]" as to how to comply with the new regulations.  *Id.*  Then-President Trump ordered DOL "to reexamine the [2016 Definition] and 'prepare an updated economic and legal analysis' of its provisions."  *Id.* (quoting 82 Fed. Reg. 9,675 (Feb. 3, 2017)).  DOL also delayed the effective dates of several provisions—including the BICE and amended PTE 84-24—by several years.  82 Fed. Reg. at 16,902.

## D. *Chamber*

The 2016 Fiduciary Rule faced immediate and numerous challenges in court. *Mkt. Synergy Grp., Inc. v. Dep't of Labor*, 2017 WL 661592 (D. Kan. Feb. 17, 2017), *aff'd* 885 F.3d 676 (10th Cir. 2018); *Chamber of Commerce v. Hugler*, 231 F. Supp. 3d 152 (N.D. Tex. 2017), *rev'd sub. nom.* 885 F.3d 360 (5th Cir. 2018); *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1 (D.D.C. 2016).  In *Chamber*, the Fifth Circuit vacated the 2016 Fiduciary Rule *in toto*, holding that it conflicted with

ERISA's text and "fail[ed] the 'reasonableness test of *Chevron* step 2." 885 F.3d at 379, 388.

The court held that when using the term "fiduciary" in ERISA, Congress drew on two sources. First, Congress incorporated the "common law understanding of fiduciary status," which "turns on the existence of a relationship of trust and confidence between the fiduciary and client." *Id.* at 370; *see also id.* at 369 ("Congress codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence . . . ."). Second, Congress also drew on the "structure of the financial services industry" and the industry's distinction "between investment advisers, who were considered fiduciaries, and stockbrokers and insurance agents, who generally assumed no such status in selling products to their clients." *Id.* at 372.

The court held that ERISA's text—which provides that a person is a fiduciary if he "renders investment advice for a fee or other compensation"—incorporated these concepts. 29 U.S.C. § 1002(21)(A). "[T]he phrase 'investment advice for a fee' . . . generally reference[s] a fiduciary relationship of trust and confidence." *Chamber*, 885 F.3d at 373. And the requirement that the fee be paid *for* investment advice "indicates that the purpose of the fee is not 'sales' but 'advice,'" "preserv[ing] the important distinction" between stockbrokers and insurance agents, who "are compensated only for completed sales [and] not on the basis of their pitch to the client," and investment advisers, who "are paid fees because they 'render advice.'"

*Id.*[4] The court explained that the 1975 Definition "captured the essence of a fiduciary relationship known to the common law as a special relationship of trust and confidence" and "echoed" ERISA's distinction between "mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does." *Id.* at 365, 374.

Measured against this standard, the 2016 Fiduciary Rule fell far short. Not only did the Rule "disregard the essential common law trust and confidence standard," it also failed to "holistically account for the language of the 'investment advice fiduciary' provision." *Id.* at 380. By "dispens[ing] with the 'regular basis' and 'primary basis' criteria used in the regulation for the past forty years," the 2016 Fiduciary Rule "encompasse[d] virtually all financial and insurance professionals who do business with ERISA plans and IRA holders," regardless of whether they were compensated for advice or completed sales. *Id.* at 366; *see also id.* at 382 (stating that the Rule "comprises nearly any broker or insurance salesperson who deals with IRA clients"). The 2016 Fiduciary Rule thus conflicted with the plain text of ERISA by including as "fiduciaries" far more individuals than the statute covered. *See id.* at 380 (stating that the Rule covered situations "where it is ordinarily inconceivable that

---

[4] The court also stated that the trust-and-confidence standard applies to the two other kinds of ERISA fiduciaries because both "define[] 'fiduciary' in 'functional terms of control and authority.'" *Chamber*, 885 F.3d at 376–77 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). "The phrase 'control and authority' necessarily implies a special relationship beyond that of an ordinary buyer and seller." *Id.* at 377. Because the investment advice fiduciary definition is "[s]andwiched between the two 'control and authority' prongs, the interpretation of [it] should gauge that subdivision by the company it keeps and should uniformly apply the trust and confidence standard in all three provisions." *Id.*

financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers").

The 2016 Rule's overbreadth was especially notable in the context of "one-time IRA rollover or annuity transactions," which were "expressly include[d]" within the Rule's ambit even though "it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchases." *Id.* at 380. "Transforming sales pitches into the recommendations of a trusted adviser mixes apples and oranges." *Id.* at 382. The BICE, which "was designed to narrow the Rule's overbreadth," did not save the Rule—"agencies 'are not free to adopt unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.'" *Id.* at 383 (quoting *Util. Air Regul. Grp. v. EPA* (*UARG*), 573 U.S. 302, 328 (2014)).

Either way, the BICE was "independently indefensible" because of several faults: "it deliberately extend[ed] ERISA Title I statutory duties of prudence and loyalty to brokers and insurance representatives who sell to IRA plans," even though "Title II has no such requirements;" it created a "vehicle for private lawsuits" without Congressional authorization; and it forced brokers and insurance agents to avoid using "contractual provisions that would have allowed arbitration of class action claims." *Id.* at 383–85. Likewise, amended PTE 84-24 was fatally infirm: by removing fixed indexed annuities from its scope, DOL had invaded the province of state and federal securities regulators. *Id.* at 385–86.

For all these reasons, the Court vacated the 2016 Fiduciary Rule *in toto.* *Id.* at 388.

In 2020, responding to *Chamber*, DOL reinstated the 1975 Definition and issued a new exemption, PTE 2020-02.    85 Fed. Reg. 82,798 (Dec. 18, 2020). PTE 2020-02 allowed insurance agents to receive commissions on sales of annuities provided they comply with Impartial Conduct Standards (including acting in the investor's best interests), acknowledge their fiduciary status in writing, and adopt policies to mitigate any conflicts of interest, among other requirements. *See Am. Secs. Ass'n v. Dep't of Labor*, 2023 WL 1967573, at *3 (M.D. Fla. Feb. 13, 2023).    DOL also "set[] forth [its] final interpretation of the five-part test of investment advice fiduciary status," taking *Chamber* into account.    85 Fed. Reg. at 82,799.    Two lawsuits challenged various aspects of that rulemaking—including one brought by several of the Plaintiffs here.    *See Am. Secs. Ass'n*, 2023 WL 1967576; *Fed'n of Ams. for Consumer Choice, Inc. v. Dep't of Labor*, 2023 WL 5682411 (N.D. Tex. June 30, 2023).

### E. The 2024 Fiduciary Rule

In recent years, DOL has continued to express concern about the "shift towards individual control over retirement investing . . . accompanied by a dramatic increase in the variety and complexity of financial products and services, which has widened the information gap between investment advice providers and the clients."    89 Fed. Reg. at 32,124.    And it maintains its position that the 1975 Definition "narrows the broad statutory definition in ways that no longer serve the purposes of Title I and Title II of ERISA to protect the interests of retirement investors."    89 Fed. Reg.

at 32,125.  Thus, notwithstanding its defeat in *Chamber*, DOL once again attempted to expand the definition of fiduciary.

On November 3, 2023, DOL published proposed regulations redefining investment advice fiduciary and again amending PTE 84-24.  Retirement Security Rule: Definition of an Investment Advice Fiduciary, 88 Fed. Reg. 75,890 (Nov. 3, 2023); Proposed Amendment to Prohibited Transaction Exemption 84-24, 88 Fed. Reg. 76,004 (Nov. 3, 2023).  DOL provided a sixty-day comment period ending on January 2, 2024.  88 Fed. Reg. at 75,890.  On December 12 and 13, 2023, DOL held hearings on the proposals.  The agency received "more than 400 comments [and] almost 20,000 petition submissions."  Docket No. 20 at 12.  On April 25, 2024, DOL issued the final versions of both regulations.  Retirement Security Rule: Definition of an Investment Advice Fiduciary, 89 Fed. Reg. 32,122 (Apr. 25, 2024) (to be codified at 29 C.F.R. part 2510) (hereinafter, the "2024 Fiduciary Rule"); Amendment to Prohibited Transaction Exemption 84-24, 89 Fed. Reg. 32,302 (Apr. 25, 2024).[5]

As relevant here, DOL made two major regulatory changes.  *First*, the 2024 Fiduciary Rule again seeks to redefine investment advice fiduciary and shed the 1975 Definition.  89 Fed. Reg. at 32,122.  Under the new rule, a person qualifies as an investment advice fiduciary in one of two ways: (1) he "represents or acknowledges that [he] is acting as a fiduciary" under ERISA; or (2) he

---

[5] DOL also issued two other regulations amending various PTEs, including PTE 2020-02.  Amendment to Prohibited Transaction Exemption 2020-02, 89 Fed. Reg. 32,260 (Apr. 25, 2024); 89 Fed. Reg. 32,346 (Apr. 25, 2024) (finalizing amendments as to other PTEs).  Plaintiffs do not challenge these regulations here.

> either directly or indirectly (e.g. through or together with any affiliate)
> makes professional investment recommendations on a regular basis as
> part of [his] business and the recommendation is made under
> circumstances that would indicate to a reasonable investor in like
> circumstances that the recommendation: is based on review of the
> retirement investor's particular needs or individual circumstances,
> reflects the application of professional or expert judgment to the
> retirement investor's particular needs or individual circumstances, and
> may be relied upon by the retirement investor as intended to advance
> the retirement investor's best interest.

*Id.* DOL "views a recommendation as a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that a retirement investor engage in or refrain from taking a particular course of action." 89 Fed. Reg. at 32,143. "The recommendation also must be provided 'for a fee or other compensation, direct or indirect' as defined in the final rule." 89 Fed. Reg. at 32,122. Under the Rule, a person "provides investment advice 'for a fee or other compensation'" if he

> receives any explicit fee or compensation, from any source, for the
> investment advice or the person (or any affiliate) receives any other fee
> or other compensation, from any source, in connection with or as a result
> of the recommended purchase, sale, or holding of a security or other
> investment property or the provision of investment advice, including,
> though not limited to, commissions . . . .

89 Fed. Reg. at 32,257 (to be codified at 29 C.F.R. § 2510.3-21(e)). The Rule further states that a "fee or compensation is paid 'in connection with or as a result of' such transaction or service if the fee or compensation would not have been paid but for the recommended transaction or the provision of investment advice." 89 Fed. Reg. at 32,257–58 (to be clarified at 29 C.F.R. § 2510.3-21(e)). DOL interprets this standard as requiring only "a link between the transaction-based compensation and the financial professional's recommendation." 89 Fed. Reg. at 32,157; *see also* 89 Fed.

Reg. at 32,158 ("[T]he Department understands the phrase 'for a fee or other compensation, direct or indirect' to encompass a broad array of compensation incident to the transaction.").

In its announcement, DOL justified the new definition on several grounds. It stated that the definition "better reflects the text and purposes of ERISA and better protects the interests of retirement investors." 89 Fed. Reg. at 32,122. Likewise, it asserted that the new definition "fills an important gap in those advice relationships where advice is currently not treated as fiduciary advice under the 1975 [Definition's] approach to ERISA's functional fiduciary definition." *Id.* DOL distinguished the new definition from the 2016 Fiduciary Rule, arguing the new rule is "far narrower" than the 2016 version and "specifically focuses on whether the investment recommendation can be appropriately treated as trust and confidence advice." 89 Fed. Reg. at 32,141; *see also id.* ("[T]he Department has been careful to craft a definition that is consistent with both the statutory text and with the Fifth Circuit's focus on relationships of trust and confidence."). DOL then explained that "[w]hen firms and financial professionals meet the requirements of this [new] definition, it would defeat . . . the investor's legitimate expectations of trust and confidence to hold that the advice was not fiduciary." *Id.* DOL contended that the 1975 Definition was "underinclusive from the standpoint of trust and confidence," stating that, as an example, "a recommendation to a plan participant to roll over a lifetime of savings and invest them in a fixed indexed annuity would not count as fiduciary advice." 89 Fed. Reg. at 32,141–42. Thus, DOL explicitly stated that the new 2024 definition

"treat[s] one-time advice as fiduciary investment advice."  89 Fed. Reg. at 32,142.
Doing so, according to DOL, is "consistent with a relationship of trust and confidence."
*Id*.

*Second*, DOL again amends PTE 84-24.  89 Fed. Reg. at 32,302.  To qualify for
the amended PTE 84-24, an insurance agent must:  (1) adhere to "Impartial Conduct
Standards" similar to those imposed by the 2016 Fiduciary Rule, including the duties
of care and loyalty; (2) make certain disclosures, including of any material conflicts;
and (3) operate under a supervisory program established by the insurance company
that created the annuity.  89 Fed. Reg. at 32,340–41.

The 2024 Fiduciary Rule and the amendment to PTE 84-24 become effective
on September 23, 2024.  89 Fed. Reg. at 32,171.  However, there is a one-year phase-
in period for the amendment to PTE 84-24 during which "parties have to comply only
with the Impartial Conduct Standards and provide a written acknowledgement of
fiduciary status" to obtain relief.  *Id.*

### F. Plaintiffs' Challenge

On May 2, 2024, Plaintiffs filed this lawsuit challenging the 2024 Fiduciary
Rule and PTE 84-24 under the Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq*.
Docket No. 1.

Plaintiff Federation of Americans for Consumer Choice, Inc. "is a trade
organization whose members are independent marketing organizations, insurance
agents, and agencies."  *Id.* ¶ 8.  Three Plaintiffs—James Holloway, James Johnson,
and Eric Crouch—are licensed insurance agents.  *Id.* ¶¶ 9–11.  And Crouch is the sole
member of Plaintiff ProVision Brokerage, LLC, an "independent insurance marketing

18

organization." *Id.* ¶ 11.  Holloway, Johnson, Crouch, and ProVision are all members of FACC.  *Id.* ¶ 15.  The complaint generally alleges "the 2024 Fiduciary Rule is inconsistent with the intent of Congress as expressed in ERISA, and [] DOL has exceeded its authority and acted arbitrarily and capriciously in promulgating" the 2024 Fiduciary Rule.  *Id.* ¶ 7.

The complaint brings two counts.  First, Plaintiffs allege that "DOL has exceeded its authority under ERISA, the Code, and the APA," thereby violating 5 U.S.C. §§ 702 and 706.  *Id.* ¶¶ 47–50.  Second, Plaintiffs allege that the 2024 Fiduciary Rule "violate[s] [§§ 702 and 706] because [it is] arbitrary, capricious, and irreconcilable with the text of ERISA and the Code." *Id.* ¶¶ 51–54.[6]  Plaintiffs ask the Court to (1) enter preliminary and permanent injunctions preventing enforcement of the 2024 Fiduciary Rule, (2) enter a declaratory judgment that DOL exceeded its authority in promulgating it, and (3) vacate and set aside the Rule in full.  *Id.* ¶ 55.

Shortly after filing their complaint, Plaintiffs moved for a stay of the Rule's effective date or a preliminary injunction prohibiting its enforcement while the case is pending.  Docket No. 8.  Plaintiffs argue they are likely to succeed on the merits because "the 2024 Fiduciary Rule conflicts with the text of ERISA" and is "unreasonable, arbitrary, and capricious."  *Id.* at 12–30.  They further contend that

---

[6]  At several points, Plaintiffs allege that DOL "rushed this latest package through at extraordinary speed."  Docket No. 1 ¶ 6; Docket No. 8 at 6 ("[A] rushed notice and comment period . . . .").  However, as Defendants point out, Plaintiffs "bring no procedural challenge to [DOL's] rulemaking."  Docket No. 20 at 12 n.3.

they—and "another 86,000 similarly situated insurance agents across the country"—
will suffer irreparable harm in the absence of a stay or preliminary injunction because
they will face "significant compliance burdens" and "new and burdensome
procedures." *Id.* at 10–12, 30 ("Indeed, some of FACC's members have already stated
that they will stop selling tax-qualified annuity products altogether because of the
new rule."). Finally, Plaintiffs argue that the "balance of harms and public interest"
"heavily favor granting a preliminary injunction." *Id.* at 30.

Defendants oppose. Docket No. 20. They argue that the 2024 Fiduciary Rule
"follows logically from the text of ERISA and is consistent with Congressional intent,"
as well as Fifth Circuit precedent. *Id.* at 15– 27. They also assert that none of the
new regulations is arbitrary and capricious. *Id.* at 36–38. And they dispute that the
equities favor injunctive relief. *Id.* at 38–39.[7]

The Court held a hearing on the motion on July 23, 2024. Docket No. 31.

## II. ANALYSIS

The APA provides that "the reviewing court" may issue equitable relief "to
postpone the effective date of an agency action or to preserve status or rights pending
conclusion of the review proceedings." 5 U.S.C. § 705; *see also, e.g., Texas v. EPA*, 829
F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the
extent necessary to prevent irreparable injury.'" (quoting § 705)). Courts grant relief
under § 705 based on the traditional four equitable factors for injunctive relief:
(1) plaintiff's likelihood of success on the merits; (2) the threat of irreparable harm

---

[7] The Court also received three *amicus curiae* briefs, two supporting and one opposing Plaintiffs'
motion. Docket Nos. 11, 16, 23.

without a stay; (3) "whether other interested parties will be irreparably injured by a stay;" and (4) the public interest.  *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1135 (5th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors are the most critical."  *Id.* (quoting *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)).  Once a plaintiff has made a showing under the first two factors, the third and fourth factors "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.

As discussed below, each factor weighs in favor of granting a stay here.  And because the Court finds a stay under § 705 is the appropriate remedy, the Court declines to order a preliminary injunction.  A stay—essentially a "temporary form of vacatur"—is a "less drastic remedy" than an injunction because it "does not order the defendant to do anything; it only removes the source of the defendant's authority."  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) (quotation omitted), *rev'd on other grounds*, 602 U.S. 367 (2024).

## A. Likelihood of Success on the Merits

Plaintiffs argue they are likely to succeed on the merits of their claim because the 2024 Fiduciary Rule and amendment to PTE 84-24 "conflict[] with the text of ERISA" and are "unreasonable, arbitrary, and capricious."  Docket No. 8 at 12–30; *see also* Docket No. 1 ¶¶ 47–55.  They contend that the 2024 Fiduciary Rule "flies in the face of the Fifth Circuit's decision in *Chamber of Commerce*."  Docket No. 8 at 7. And they argue the amendment to PTE 84-24 "disregard[s] the realities of how insurance agents operate in the independent distribution channel and will be highly disruptive and bring harm to [the] industry and consumers."  *Id.* at 30.  Defendants

respond that the 2024 Fiduciary Rule "is far more modest in scope than the 2016 Rule vacated" in *Chamber* and is "consistent with *Chamber*'s conclusion that ERISA only intended to reach advice relationships involving 'trust and confidence.'"   Docket No. 20 at 2.

Defendants are wrong.

### 1. Conflict with the Statute

Congress enacted the APA in 1946 "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).  The APA thus requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority."   5 U.S.C. § 706(2)(A), (C).

In reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and should "set aside any [] action inconsistent with the law as they interpret it." *Loper Bright*, 144 S. Ct. at 2261, 2273; *see also Chamber*, 885 F.3d at 369 ("A regulator's authority is constrained by the authority that Congress delegated it by statute.").  A court should no longer defer to an agency's interpretation of a statute but should decide for itself "whether the law means what the agency says." *Loper Bright*, 144 S. Ct. at 2261 (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

The Court thus owes no deference to DOL's interpretation of ERISA, but rather "begins with the text" of the statute—as all courts do.  *E.g.*, *Ross v. Blake*, 578 U.S. 632, 638 (2016); *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[A] legislature says in a statute what it means and means in a statute what it says there.").   In doing so, the Court applies the "fundamental canon of statutory construction" that the words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute."  *E.g.*, *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *Loper Bright*, 144 S. Ct.  at 2266 ("[E]very statute's meaning is fixed at the time of enactment.*"* (quoting *Wis. Cent. Ltd.* v. *United States*, 585 U.S. 274, 284 (2018))).  The Court, moreover, must examine "the language and design of the statute as a whole." *E.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (Courts "must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous.").

Now to the text of the statute that governs here.  ERISA states that a "person is a fiduciary with respect to a plan to the extent . . . he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."  29 U.S.C.

§ 1002(21)(A); *see also* I.R.C. § 4975(e)(3)(B).  The Court does not construe this text in a vacuum.  Rather, it is bound by the Fifth Circuit's extensive and well-reasoned decision in *Chamber*.  As discussed above, *Chamber* held that ERISA codified the common law understanding of fiduciary—which is based on a "relationship of trust and confidence" between the fiduciary and the client.  885 F.3d at 369–70.  *Chamber* also held that ERISA incorporated the financial service industry's distinction between mere sales conduct and investment advice.  *Id.* at 372–76.  Guided by *Chamber*, the Court concludes that the 2024 Fiduciary Rule conflicts with ERISA's text in three primary ways.  DOL's arguments to the contrary are unpersuasive.

**1.** The 2024 Fiduciary Rule eliminates the "regular basis" and "primary basis" criteria that are essential to the meaning of "fiduciary" in ERISA.  In omitting these requirements, DOL makes the same mistake that led *Chamber* to set aside the 2016 Rule.

*Chamber* explained that "[f]or the past forty years, DOL has considered the hallmarks of an 'investment advice' fiduciary's business to be its 'regular' work on behalf of a client and the client's reliance on that advice as the 'primary basis' for her investment decisions."  *Id.* at 369.  DOL codified these requirements in the 1975 Definition, which stated that a person is a fiduciary to the extent he renders investment advice "on a regular basis to the plan," "pursuant to a mutual agreement" between the fiduciary and plan, and "as a primary basis for investment decisions with respect to plan assets."  29 C.F.R. § 2510.3-21(c)(1)(ii)(B).  The "regular basis" factor ensured that the fiduciary regularly advised a specific client—as would be expected

in a relationship of trust and confidence.  *See, e.g., Schloegel v. Boswell*, 994 F.2d 266, 273 (5th Cir. 1993) (holding that "only a few instances" of "providing investment-type of advice . . . falls far short" of a fiduciary relationship under ERISA); *Fuller v. SunTrust Banks, Inc.*, 2019 WL 1996693, at *14–15 (N.D. Ga. Mar. 29, 2019) (same). And the "primary basis" criterion reflected that the fiduciary's advice would be the primary basis for the client's investment decisions—again, consistent with a well-established relationship between an adviser and client built on trust and confidence. *See Chamber*, 885 F.3d at 366.

In promulgating the 2016 Rule, DOL eliminated these requirements because the agency wanted to expand the meaning of "fiduciary" to encompass "one-time transactions like IRA rollovers."  *Id.* at 365–66.  *Chamber* held that this expansion went too far and conflicted with ERISA.  The 2016 Rule "encompasse[d] virtually all financial and insurance professionals who do business with ERISA plans and IRA holders."  *Id.* at 366.  The Rule "disregard[ed] the essential common law trust and confidence standard," expanded the meaning of "fiduciary" far beyond what Congress intended, and conflicted with the plain text of the statutory definition.  *See id.* at 379–80.

The 2024 Fiduciary Rule falters in the same way.   DOL explained in promulgating the 2024 Rule that the "regular basis" requirement "defeat[ed] legitimate investor expectations by automatically excluding one-time advice from treatment as fiduciary investment advice."  89 Fed. Reg. at 32,150.  So DOL amended the requirement, stating now that the person need only "make[] professional

investment recommendations to investors on a regular basis *as part of [his] business*"—not to any particular client.  89 Fed. Reg. at 32,256 (to be codified at 29 C.F.R. 2510.3-21(c)(1)(i)) (emphasis added).  DOL also denounced the "primary basis" requirement as "not found in the text of the statute" and as "difficult to apply, unclear in its meaning, and ill-suited to determining whether the advisory relationship is one of trust and confidence."  89 Fed. Reg. at 32,153.  DOL thus omitted the requirement altogether, asking instead whether a "reasonable investor in like circumstances" would view the recommendation as being capable of "be[ing] relied upon . . . as intended to advance the retirement investor's best interests."  89 Fed. Reg. at 32,256 (to be codified at 29 C.F.R. 2510.3-21(c)(1)(i)).

With these changes, the 2024 Fiduciary Rule—like the 2016 Rule—will capture transactions that do not satisfy the established "relationship[s] of trust and confidence" contemplated by ERISA.  One example:  the 2024 Rule will treat one-time recommendations to roll over assets from a Title I plan to an IRA, "even if not accompanied by a specific recommendation on how to invest assets, . . . as fiduciary investment advice."  *See* 89 Fed. Reg. at 32,144.   But as *Chamber* held in setting aside the 2016 Rule, "it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers" when making a one-time rollover recommendation.  885 F.3d at 380.

The 2024 Rule fails for this reason alone.

**2.**   The 2024 Fiduciary Rule also conflicts with ERISA's requirement that the fiduciary "render[] investment advice *for a fee or other compensation*."   29 U.S.C. § 1002(21)(A) (emphasis added).   This provision of ERISA uses "terms of art within the financial services industry" and recognizes the distinction between "investment advisers, who [are] considered fiduciaries, and stockbrokers and insurance agents, who generally assume[] no such status in selling products to their clients." *Chamber*, 885 F.3d at 372–74.   This distinction turns on the method of compensation: stockbrokers and insurance agents "are compensated only for completed sales . . . not on the basis of their pitch to the client," while investment advisers "are paid fees because they 'render advice.'"   *Id.* at 373.   Thus, ERISA requires that the professional be paid for advice—not for a sale—to be a fiduciary.   As the *Chamber* court explained, "the preposition 'for' [] indicates that the purpose of the 'fee' is not 'sales' but 'advice.'"   *Id*.

The 2024 Fiduciary Rule dispenses with this requirement.   Again, the 2024 Rule states:

> [A] person provides investment advice "for a fee or other compensation, direct or indirect," if the person (or any affiliate) receives any explicit fee or compensation, from any source, for the investment advice or the person (or any affiliate) receives any other fee or other compensation, from any source, *in connection with or as a result of* the recommended purchase, sale, or holding of a security or other investment property or the provision of investment advice, including, though not limited to, commissions . . . .

89 Fed. Reg. at 32,257 (to be codified at 29 C.F.R. § 2510.3-21(e)) (emphasis added). The Rule further provides that a "fee or compensation is paid 'in connection with or as a result of' such transaction or service if the fee or compensation would not have

been paid but for the recommended transaction or the provision of investment advice." 89 Fed. Reg. at 32,257–58 (to be codified at 29 C.F.R § 2510.3-21(e)). DOL interprets this but-for standard as requiring only "a link between the transaction-based compensation and the financial professional's recommendation." 89 Fed. Reg. at 32,157.[8] But ERISA requires more than a mere link—after all, there is a link between the commission a stockbroker receives from a stock sale, and *Chamber* held that stockbrokers are not fiduciaries under ERISA. *See, e.g.,* 885 F.3d at 373 ("Only in DOL's semantically created world do salespeople and insurance brokers have 'authority' or 'responsibility' to 'render investment advice.'" (quoting 29 U.S.C. § 1002(21)(A)). The but-for standard also conflicts with ERISA's text by capturing fees paid either for "the recommended transaction *or* the provision of investment advice." 89 Fed. Reg. at 32,257–58 (to be codified at 29 C.F.R § 2510.3-21(e)). But ERISA requires that the fee be paid for investment *advice*, not for a mere recommendation on a financial product. *See Chamber*, 885 F.3d at 373 (stating that ERISA requires the "fee or other compensation" be paid "for" "advice").

DOL claims this expansion is nothing new: "The Department has consistently interpreted the statutory language 'for a fee or other compensation, direct or indirect' to include transaction-based compensation since the adoption of the 1975 regulation."

---

[8] DOL also has a broad view of what qualifies as a "recommendation:" "[A] recommendation [i]s a communication that, based on its content, context, and presentation, would reasonably be viewed as a suggestion that the retirement investor engage in or refrain from taking a particular course of action." 89 Fed. Reg. at 32,143. Notably, this is the same definition of "recommendation" that DOL adopted in the 2016 Fiduciary Rule. *See* 29 C.F.R. § 2510.3-21(b)(1) (2017). This definition captures almost any communication between a professional and client, even those that are simply "ordinary buyer-seller interactions." *Chamber*, 885 F.3d at 374. This also conflicts with ERISA. *See id.* at 382 ("Transforming sales pitches into the recommendations of a trusted adviser mixes apples and oranges.").

89 Fed. Reg. at 32,158.  It also asserts that "[t]his treatment of investment compensation is in accord with the actions of other State and Federal regulators, and with the modern marketplace for investment advice."  89 Fed. Reg. at 32,157.  But *Chamber* is clear—ERISA contemplates a fee not for "'sales' but 'advice.'"  885 F.3d at 373.  The 2024 Rule conflicts with this statutory requirement.

**3.**  The 2024 Fiduciary Rule conflicts with ERISA by ignoring the distinction between DOL's regulatory authority under Title I, which is expansive, and Title II, which is limited.  "ERISA Titles I and II distinguish between DOL's authority over [Title I] plans and individual IRA accounts."  *Chamber*, 885 F.3d at 381.  Title I fiduciaries "must adhere to the traditional common law duties of loyalty and prudence," while IRA fiduciaries "are not saddled with these duties."  *Id.*  Furthermore, "DOL is given no direct statutory authority to regulate" IRA fiduciaries:  it may only "defin[e] technical and accounting terms" and grant PTEs.  *Id.* (citing 29 U.S.C. §§ 1108(a), 1135, and then I.R.C. § 4975(c)(2)).  Thus, "DOL may [not] comparably regulate fiduciaries to [Title I plans] and IRAs."  *Id.*  *Chamber* held that the 2016 Rule "failed to follow" this "clear distinction" by "treating IRA financial services providers in tandem with [Title I] plan fiduciaries."  *Id.* at 381–82.

DOL repeats the error in the 2024 Fiduciary Rule.  By capturing one-time rollover and annuity recommendations in its scope, the 2024 Fiduciary Rule will again impose Title I duties on IRA service providers.  This conflicts with ERISA, as *Chamber* held.  *See id.*  Even more, the amendment to PTE 84-24 requires financial services providers to abide by "Impartial Conduct Standards," including the duties of

loyalty and care, to receive a commission for a sale.  *See* 89 Fed. Reg. at 32,340–41. In other words, DOL expanded the definition of investment advice fiduciary to capture IRA service providers, and then simultaneously imposed fiduciary duties upon them as a condition of receiving commissions.  This exceeds DOL's statutory authority.

In response, DOL claims it has "relevant authority over ERISA Title II plans, including IRAs," stating "Titles I and II are covered by the same general definition of fiduciary and the same framework of prohibited transactions."  Docket No. 20 at 28–29.  But *Chamber* is clear—DOL may not regulate IRA providers "in tandem with" Title I fiduciaries.  885 F.3d at 381.  The 2024 Rule unabashedly does so, "impermissibly conflat[ing] the basic division drawn by ERISA."  *Id.*

**4.**  In response to these problems, DOL initially asserts that *Chamber* is wrong. ERISA's definition is "expansive," DOL contends, and its "statutory text makes clear that Congress did not limit fiduciary status to those already recognized as [a] fiduciary under the common law or another statute."  Docket No. 20 at 15–16. *Chamber*, in fact, "inverts the most straightforward reading of how Congress was using the well-recognized 'fiduciary' category" in ERISA.  *Id.* at 21 n.8.  And finally, "ERISA does not distinguish between sales commissions and retainer fees" or "recognize[] . . . the supposed dichotomy between 'salespeople' and fiduciaries."  *Id.* at 29, 33.  But this Court is bound by *Chamber* and its interpretation of ERISA.  *See, e.g.*, *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992) ("It has long been established that a legally indistinguishable decision of this court

must be followed by other panels of this court and district courts unless overruled en banc or by the United States Supreme Court.").

Alternatively, DOL argues that the 2024 Fiduciary Rule complies with *Chamber*.  Docket No. 20 at 20–27.  DOL points out that "the Rule's preamble . . . us[es] the phrase 'trust and confidence' at least 80 times and cit[es] *Chamber* more than 40 times."  *Id.* at 23 n.9.  Mere lip service to *Chamber*, however, is insufficient. As explained above, the 2024 Fiduciary Rule adopts an approach that is fundamentally at odds with *Chamber*—and ERISA's text.  DOL also contends that the 2024 Fiduciary Rule "omits several specific aspects of the [2016 Rule] that the Fifth Circuit found objectionable."  *Id.* at 20.  It argues, for example, that the 2024 Rule does not "creat[e] a private right of action for retirement investors against advisors, brokers, and agents."  *Id.* at 21.  But the Rule nevertheless imposes fiduciary status in circumstances that ERISA does not allow.  And, in any event, as explained below, DOL implicitly created a private right of action by requiring agents like Plaintiffs to affirm in writing they are fiduciaries under ERISA to fall within the protections of PTE 84-24.  In doing so, DOL "assum[ed] [] non-existen[t] authority to create private rights of action in violation of the separation of powers."  *Id.* at 384–85.

**5.**  As *Chamber* noted, yet another reason to be "skeptical" of the DOL's new definition of "investment advice fiduciary" is that the agency has "claim[ed] to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy."  *Id.* at 387 (quoting *UARG*, 573 U.S. at 324); *see also West Virginia v. EPA*, 597 U.S. 697, 724 (2022) ("[W]e 'typically greet' assertions

of 'extravagant statutory power over the national economy' with 'skepticism.'" (quoting *UARG*, 573 U.S. at 324)).  As in 2016, DOL has made "no secret of its intent to transform the trillion-dollar market for IRA investments, annuities and insurance products, and to regulate in a new way the thousands of people and organizations working in that market." *Chamber*, 885 F.3d at 387.  And as in 2016, DOL has "utilized two transformative devices" to accomplish that goal:  it has "reinterpreted the [fifty]-year old term 'investment advice fiduciary' and exploited an exemption provision into a comprehensive regulatory framework." *Id.*  Accepting DOL's interpretation of ERISA would grant it "virtually unlimited power to rewrite" the statute's text, "effect[ing] a fundamental revision of the statute [and] changing it from one sort of scheme of regulation into an entirely different kind." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (quotation omitted).  "It is not hard to spot regulatory abuse of power" in a case like this. *Chamber*, 885 F.3d at 387.

Thus, as *Chamber* held regarding the 2016 Fiduciary Rule, the major questions doctrine supplies an additional basis for concluding that the 2024 Fiduciary Rule violates the APA. *See id.* at 388; *see also UARG*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" (quotation omitted)); *West Virginia v. EPA*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" (quotation omitted)).

*      *      *

32

Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the 2024 Fiduciary Rule conflicts with the text of ERISA in violation of the APA.

## 2. Arbitrary and Capricious

The APA provides that a court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) ("[The] court 'must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment.'" (quotation omitted)). While "[j]udicial review under that standard is deferential," *Prometheus*, 592 U.S. at 423, it "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019); *see also Texas v. United States*, 40 F.4th at 226 (stating that the arbitrary-and-capricious standard "has serious bite"). The Court must consider whether an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 513 (2009) (quotation omitted). The Court also must ensure that the agency "has acted within a zone of reasonableness." *Prometheus*, 592 U.S. at 423. But the court "may not substitute its own policy judgment for that of the agency." *Id.* "An agency's action must be upheld, if at all, on the basis articulated by the agency itself, not reasons developed post hoc." *Texas v. United States*, 40 F.4th at 226 (cleaned up).

Plaintiffs argue that "DOL acted arbitrarily and capriciously in amending PTE 84-24." Docket No. 8 at 26–30.  They are correct.  As discussed above, *Chamber* held that the 2016 Rule's overbroad definition of "investment advice fiduciary" "comprise[d] nearly any broker or insurance salesperson who deals with IRA clients." 885 F.3d at 382; *see also id.* at 381 (stating the 2016 Rule "impermissibly conflates the basic division drawn by ERISA" between Titles I and II).  *Chamber* then stated that the BICE and the amendment to PTE 84-24 "subject[ed] most of these newly regulated actors and transactions to a raft of affirmative obligations," including "obligations of loyalty and prudence only statutorily required of [Title I] fiduciaries." *Id.* at 382; *see also id.* at 384 (stating that DOL "deliberately extend[ed] ERISA statutory duties of prudence and loyalty to brokers and insurance representatives who sell to IRA plans, although Title II has no such requirements").  Additionally, DOL had created a private cause of action through the BICE to enforce violations of those duties, even though Title II does not authorize such suits.  *See id.* at 384.  "The grafting of novel and extensive duties and liabilities on parties otherwise subject only to the prohibited transactions penalties [required by Title II] is unreasonable and arbitrary and capricious."  *Id.*

DOL repeats these errors in amending PTE 84-24.  As noted above, the 2024 Fiduciary Rule expands the definition of "investment advice fiduciary" to include nearly any insurance agent or stockbroker who interacts with an IRA investor.  *See supra* Section II.A.1.  The amendment to PTE 84-24 then imposes virtually the same "Impartial Conduct Standards" that the BICE imposed—including duties of loyalty

and care that Title II does not include.  *See* 89 Fed. Reg. at 32,340–41.  And in doing so, the amendment to PTE 84-24 exposes IRA service providers to breach-of-fiduciary-duty liability, essentially recreating the 2016 Rule's private cause of action.  *See* Section II.A.1.  In other words, the amendment to PTE 84-24 uses the Rule's overbroad definition to impose "novel and extensive duties and liabilities on parties otherwise subject only to the prohibited transactions penalties" of Title II.  *Chamber*, 885 F.3d at 384.  DOL once again "exploit[s] an exemption provision into a comprehensive regulatory framework," "impermissibly bootstrap[ping] what should [be a] safe harbor criteria into 'backdoor regulation.'"  *Id.* at 387–88 (quotations omitted).  Doing so is "unreasonable and arbitrary and capricious."  *Id.* at 384.[9]

The Court therefore concludes that Plaintiffs are also likely to succeed on the merits of their arbitrary-and-capricious claim.

## B. Irreparable Harm

To obtain a stay or injunction, Plaintiffs must also demonstrate "a substantial threat of irreparable injury if the injunction is not issued."  *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quotation omitted).  For the threat of injury to be sufficiently "substantial," Plaintiffs must show that they are "likely to suffer

---

[9]  Plaintiffs also argue that the 2024 Fiduciary Rule is 'occupying Dodd-Frank turf' in contravention of Congress' intent and seeking to supplant state insurance regulation in the same manner as the 2016 Fiduciary Rule."  Docket No. 8 at 29.  *Chamber* noted that in the Dodd-Frank Act, Congress prohibited the SEC from eliminating commissions for broker-dealers and opted to leave regulation of fixed indexed annuities to states.  885 F.3d at 385.  The 2016 Rule both prohibited broker-dealers from receiving commissions (unless they qualified for a PTE) and regulated fixed indexed annuities.  *See id.* at 385–86.  Thus, DOL had failed to "defer[] to Congress's very specific Dodd-Frank delegations" and "occup[ied] the Dodd-Frank [Act's] turf."  *Id.* at 386.  The parties have not fully developed their arguments on this point, and thus the Court does not address it.  The Court notes, however, that the 2024 Fiduciary Rule again prohibits broker-dealers from receiving a commission and regulates all annuities (not just fixed indexed ones), and it therefore seems likely that this argument will only bolster Plaintiffs' case on the merits.

irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  An injury is sufficiently "irreparable" if it "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017).  Where, as here, "the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for preliminary injunction." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam)), *aff'd*, 140 F.3d 1060 (D.C. Cir. 1998).

Here, Plaintiffs argue that "complying with the 2024 Fiduciary Rule and PTE 84-24 will subject [them] to significant compliance burdens, including additional disclosures and documentation for all tax-qualified annuity sales, potential liability under ERISA, and potential enforcement actions by the DOL."  Docket No. 8 at 11.  If they comply with PTE 84-24, moreover, Plaintiffs "will be required . . . to declare that they are, in fact, fiduciaries, which is a bell that cannot be un-rung if these new regulations are later vacated."  *Id.*  Many of FACC's members "have already stated that they will stop selling tax-qualified annuity products together because of the new rule."  *Id.*  And, finally, Plaintiffs argue that, although the 2024 Fiduciary Rule and amended PTE 84-24 will not take effect until September 23, 2024, a stay of the effective date is necessary now because of the ramp-up required for them to prepare for the new requirements.  *See id.* at 12.

To their credit, Defendants "do not challenge Plaintiffs' . . . ability to establish irreparable harm as regulated entities."  Docket No. 20 at 14 n.5.  Accordingly, the Court finds that this factor weighs in favor of issuing a stay.

### C. Balance of the Equities and Public Interest

The third and fourth factors require the Court to weigh the harms and public interest in granting or denying Plaintiffs' requested relief.  "Federal courts have considered the balance of equities and public interest factors together as they overlap considerably."  *Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021) (citing cases); *Nken*, 556 U.S. at 435 (holding that the balance of equities and public interest considerations "merge when the Government is the opposing party").

Plaintiffs argue that they and "another 86,000 similarly situated insurance agents across the country" will face "severe and irreparable harm" if a stay of the effective date is not granted.  Docket No. 8 at 30.  They further contend that "there will be a corresponding loss or limitation of access to annuities," harming the public and many retirement savers.  *Id*.  Maintaining the status quo, in contrast, will leave in place the five-part test from the 1975 Definition, which the Fifth Circuit approved in 2018.  *See id*.  Defendants disagree, arguing that the balance of harms and the public interest "tilt sharply against the issuance of [] injunctive relief" because any harm to Plaintiffs is limited and an injunction or stay "would harm Defendants in executing their statutory responsibilities and disserve the public interest."  Docket No. 20 at 38–39.

The Court finds that the injuries likely to occur if a stay is not granted easily outweigh "any harm that will result if the injunction is granted."  *Texas v. United*

*States*, 809 F.3d at 186 (quoting *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013)).   Plaintiffs have shown a "concrete threatened injury" in the form of significant costs necessary to comply with the new Rule.  *Id*.  These "increased costs of compliance" and "necessary alterations in operating procedures," moreover, are the kinds of irreparable injury that support a preliminary injunction or stay—in part because they are not easily restored.  *Career Colls. & Schs. of Texas v. Dep't of Education*, 98 F.4th 220, 235 (5th Cir. 2024); *see also Texas v. United States*, 809 F.3d at 187 (finding preliminary injunction appropriate "given the difficulty of restoring the status quo ante").  Defendants' claimed harms, in contrast, are less substantial and vaguely defined—and are based on a clear misreading of ERISA and *Chamber*. *See, e.g., Texas v. United States*, 809 F.3d at 187; *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (finding alleged compliance costs outweighed agency's interest in perpetuating "unlawful agency action").

Finally, the public interest "always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Camacho v. Tex. Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004) (quoting *Finlan v. City of Dallas*, 888 F. Supp. 779, 791 (N.D. Tex. 1995)).  As explained above, the 2024 Fiduciary Rule likely violates the law and exceeds the scope of DOL's authority. The public interest in a stay of the Rule's effective date thus outweighs DOL's interest in the freedom to implement its own policies.  *See Wages & White Lion*, 16 F.4th at 1143 ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).

Accordingly, the third and fourth factors weigh in favor of a stay here.

### D. Scope of Relief

The APA permits "the reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is pending review. 5 U.S.C. § 705. Defendants argue that "[a]ny injunctive relief should be appropriately tailored and limited to the Plaintiffs before the Court." Docket No. 20 at 40. But "[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited" to the parties before the Court. *Career Colls.*, 98 F.4th at 255. Rather, "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Id.*; *see also All. for Hippocratic Med.*, 78 F.4th at 254 (affirming a universal stay under Section 705 because "a stay is the temporary form of vacatur" under Section 706).

The Court will not limit the stay to the parties in this case for three related reasons. *First*, because the 2024 Fiduciary Rule is likely unlawful as to Plaintiffs, it is also likely unlawful as to all other similarly situated investment professionals. *See* Docket No. 8 at 30 (noting the existence of "another 86,000 similarly situated insurance agents across the country" who will be irreparably harmed by the Rule); *see also Career Colls.*, 98 F.4th at 255 ("The almost certainly unlawful provisions of the Rule that CCST challenges apply to all Title IV participants and are thus almost certainly unlawful as to all Title IV participants."); *Ams. for Beneficiary Choice v. HHS* (*AFBC*), 2024 WL 3297527, at *7 (N.D. Tex. July 3, 2024) ("Because the Fixed

Fee and Contract-Terms Restrictions are likely unlawful against the Plaintiffs, they are also almost certainly unlawful as to other industry actors.").

*Second*, DOL promulgated the 2024 Fiduciary Rule to "establish a uniform definition for all persons giving investment advice to retirement investors under Title I and Title II of ERISA." 89 Fed. Reg. at 32,137. But DOL seeks "piecemeal enforcement" of this stay, where some investment professionals are exempt from the Rule and others are not. *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023), *vacated as mooted*, 144 S. Ct. 480 (2023) (Mem.). "That undermines rather than supports the Government's purported interest in consistency across government in enforcement of this" nation-wide regulation. *Id.* (cleaned up); *see also Career Colls.*, 98 F.4th at 255 ("The Department's protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards."); *AFBC*, 2024 WL 3297527, at *7 ("The Final Rule seeks to prescribe uniform standards and applies to all agents and firms that participate in the MA ecosystem—not just the parties to these cases.").

And *third*, Plaintiffs—including, as Defendants concede, FACC's members— "do not need relief only for themselves but also for the [businesses] that engage with them." *AFBC*, 2024 WL 3297527, at *7. Permitting the 2024 Fiduciary Rule and new PTE 84-24 to take effect could cause non-parties to this suit to withdraw from the investment market altogether—as happened when the 2016 Rule took effect. *See Chamber*, 885 F.3d at 368 ("The Fiduciary Rule has already spawned significant market consequences, including the withdrawal of several major companies,

including Metlife, AIG and Merrill Lynch . . . [and] [c]ompanies like Edward Jones and State Farm have limited the investment products that can be sold to retirement investors."); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (stating that courts should "provide complete relief to the plaintiffs.").  Thus, limiting a stay to the parties "would prove unwieldy and would only cause more confusion." *Feds for Med. Freedom*, 63 F.4th at 388; *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

Therefore, the Court will not limit its stay to the parties before the Court.

### III. CONCLUSION

In sum, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the 2024 Fiduciary Rule conflicts with ERISA's text by redefining "investment advice fiduciary" to include non-trust-and-confidence relationships. Additionally, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the amendment to PTE 84-24 is an arbitrary and capricious exercise of DOL's regulatory power.  The Court also finds that Plaintiffs would suffer irreparable harm in the absence of relief—as Defendants concede—and that the equities and public interest weigh in favor of a stay here.

Accordingly, the Court hereby **GRANTS** Plaintiffs' motion and stays the effective date of the following regulations until further order of the Court:

(1) Retirement Security Rule: Definition of an Investment Advice Fiduciary, 89 Fed. Reg. 32,122 (Apr. 25, 2024) (to be codified at 29 C.F.R. part 2510).

(2) Amendment to Prohibited Transaction Exemption 84-24, 89 Fed. Reg. 32,302 (Apr. 25, 2024).

**Signed this**

**Jul 25, 2024**

_____

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE